59 Cal.App.2d 744 (1943)
Estate of LULU A. McCOLLUM, Deceased. JENNIE McCOLLUM YOUNG et al., Appellants,
v.
J. BELDEN BIAS, Jr., et al., Respondents.
Civ. No. 2871. 
California Court of Appeals. Fourth Dist. 
July 22, 1943.
 F. F. Grant and Don C. Bitler for Appellants.
 P. A. Whitacre, J. A. Donnelley and Lucas & Wyckoff for Respondents.
 MARKS, J.
 This is an appeal from a judgment admitting to probate the last will and testament of Lulu A. McCollum, deceased, and appointing an executor. The proponents of the will are two nephews of deceased who were named in it as principal beneficiaries. The other beneficiary is Beatrice Burger who was an intimate friend of deceased. The contestants are stepchildren of deceased.
 Emmet S. McCollum went to Imperial Valley in 1902. He was then married and had seven children. He bought property there which he operated as a dairy with the help of his children. His wife died in 1905 and he married his second wife in 1909, the Lulu A. McCollum whose estate is involved here.
 The dairy farm was sold and Mr. and Mrs. McCollum bought a home in San Diego, the title to which was placed in the name of Mrs. McCollum, as was a smaller farm which was purchased in Imperial Valley. The record titles remained in her name until the day after the death of Mr. McCollum on September 17, 1938. Mr. and Mrs. McCollum were a happy, devoted and affectionate married couple.
 There is no showing that Mrs. McCollum had any property at the time of her marriage nor that she engaged in any gainful occupation. As far as the record discloses the property belonging to Mrs. McCollum at the time of her death represented the proceeds of that owned by Mr. McCollum at the time of their marriage, and increases resulting from it. After *746 coming to San Diego the couple lived on the income from that property.
 There was no issue from this marriage and the heirs at law of Mrs. McCollum at the time of her death in 1939 were nephews and nieces and their children.
 After the marriage of Mr. and Mrs. McCollum in 1909, Mr. McCollum's seven children remained in the family home, but within a few years the older ones began drifting away because they did not like the family discipline of the stepmother. While there seemed to be some affection between Mrs. McCollum and two of the children, this did not seem to extend to the other five. There is evidence in the record indicating that Mrs. McCollum regarded all of these children as shiftless and inconsequential.
 Mrs. McCollum lived in Santa Cruz prior to her marriage. Harry J. Bias and J. Belden Bias, residents of the same city, were her favorite nephews and she entertained a strong affection for them. Mr. and Mrs. McCollum visited them in Santa Cruz and they visited at the San Diego home of the McCollums. Harry J. Bias was an attorney at law. Robert B. Bias, the son of J. Belden Bias, was admitted to practice law in 1938. He was employed in the office of his uncle until about September, 1941, when he entered the office of the general counsel for the Civil Aeronautics Board in Washington, D. C.
 Mr. and Mrs. McCollum became financially embarrassed during the depression and Mrs. McCollum's nephews came to their assistance with loans which were not repaid. The record indicates that but for this financial assistance Mr. and Mrs. McCollum might have lost their properties.
 Mrs. McCollum executed a will dated March 24, 1930, in which she left all of her property to her husband, or, in case he predeceased her, to his seven children. She executed another will dated August 31, 1934, leaving her husband a life estate in her property with the fee, subject to this life estate, to the seven children.
 Mrs. McCollum had a paralytic stroke in 1937 and thereafter had difficulty with her speech. She was very heavy, had high blood pressure and in the last year of her life could not walk without assistance.
 Mr. McCollum executed a will the day before he died. In it he nominated Letha O. W. Cordrey, a friend, as executrix and as guardian of his wife, reciting that Mrs. McCollum was not competent to manage her affairs. *747
 On September 18, 1938, the day following Mr. McCollum's death, Mrs. Cordrey took charge of Mrs. McCollum and her properties. She recorded two deeds conveying the property in Imperial Valley and the home in San Diego from Mrs. McCollum to Mr. McCollum. Mrs. Cordrey, with her associate, Miriam W. Hezar, were indebted to Mrs. McCollum in the sum of approximately $10,000.
 On January 14, 1939, Mrs. Cordrey filed a petition to be appointed guardian of the person and estate of Mrs. McCollum. This petition did not list as assets of the estate the real property, deeds to which had been recorded after the death of Mr. McCollum. A contest to the petition was filed by J. Belden Bias on the ground that Mrs. Cordrey was indebted to the guardianship estate and that the recording of the two deeds had clouded the title of the real estate of Mrs. McCollum, necessitating suits to quiet title against the estate of Emmet S. McCollum.
 A physician employed by Mrs. Cordrey filed an affidavit in the guardianship proceedings reciting that Mrs. McCollum, because of physical disability and general mental incompetency, could not attend the guardianship hearing. This affidavit was sworn to on January 19, 1939. The hearing was had on January 27, 1939, and Mrs. McCollum not only appeared in court but was interrogated by the judge who presided at the hearing. She requested the appointment of Beatrice Burger, a long time friend, as her guardian.
 The trial court found that Mrs. McCollum, "by reason of old age, disease, and physical infirmity, is unable, unassisted, properly to manage and take care of herself or her property. ..." The petition of Mrs. Cordrey was denied and Mrs. Burger was appointed guardian of the person, and a San Diego bank was appointed guardian of the estate of Mrs. McCollum. We find in the record an order authorizing and directing the guardian of the estate to institute suits against the estate of Emmet S. McCollum to quiet title to the San Diego home and the Imperial County farm. We are informed by counsel for respondents that both actions have been filed and that judgment quieting title to the San Diego home has been entered and that the other action is pending in Imperial County.
 On January 26, 1939, Mrs. McCollum executed a third will revoking all previous wills, leaving the San Diego home to Harry J. Bias, the Imperial County farm to J. Belden Bias, *748 her jewelry and personal effects to Mrs. Burger and the residue equally to her two nephews. J. Belden Bias was named as executor and he filed this will for probate. A contest was instituted by the seven children of Mr. McCollum on the grounds of mental incompetency, duress, menace and undue influence of the three legatees, and improper execution of the will. After a trial before the court without a jury this will was admitted to probate and the contestants have appealed.
 The trial court found all facts in favor of the petitioner and against the contestants. The insufficiency of the evidence to support these findings, together with errors in receiving and rejecting evidence, are urged as grounds for reversal of the judgment.
 Little need be said about the due execution of the will. All the evidence on this subject shows that the formalities of law were observed and the findings upholding due execution may not be questioned. There was no evidence of menace or duress so these grounds of contest may be summarily dismissed from consideration here, leaving the questions of mental capacity and undue influence to be considered.
 The evidence of proponents discloses that Harry J. Bias visited his aunt in San Diego just after the death of her husband; that Mrs. McCollum told him that the death of her husband had changed the situation concerning the disposition of her property; that she wanted to make a new will and leave the San Diego home to Harry, the Imperial County farm to J. Belden Bias, and some remembrance to Mrs. Burger. Harry J. Bias discovered that Mrs. Cordrey had recorded the two deeds but he did not tell his aunt of this because he did not want to cause her worry. He did advise her to obtain independent legal advice from some attorney in San Diego.
 J. Belden Bias and his wife visited Mrs. McCollum in October and again in December, 1938. She expressed to them the same desires concerning the testamentary disposition of her property.
 On January 13, 1939, Mrs. Burger took Mrs. McCollum to interview an attorney whom Mrs. McCollum authorized, in writing, to act for her and to represent her in every way in protecting her property rights. This attorney was the personal attorney of Mrs. Burger. He had not met Mrs. McCollum prior to that date. He did not know Harry J., nor J. Belden Bias, and did not meet either of them until about January 26, 1939. *749
 Robert B. Bias was the grandnephew of Mrs. McCollum. He, with J. Belden Bias and his wife, came to San Diego on January 25, 1939, and saw Mrs. McCollum on that and the two succeeding days. Mrs. McCollum again explained the disposition she desired to make of her property. Robert made pencil notes of the directions given him by Mrs. McCollum which he took to the office of the San Diego attorney the following morning. The attorney dictated the will which was delivered to Robert after it had been transcribed. On the afternoon of the same day J. Belden Bias, his wife and Robert, took Mrs. McCollum to the home of Thomas A. Bruning, an intimate friend of long standing of Mr. and Mrs. McCollum. The will was read to Mrs. McCollum by Robert in the presence of Mr. Bruning, his wife and daughter, and Mr. and Mrs. Bias. All of these persons, except Mr. Bruning who had died, testified that Mrs. McCollum understood the contents of the will; that she said it was just what she wanted; that it was executed in accordance with the formalities of law. All of these witnesses testified that Mrs. McCollum understood the terms of the will, knew what she was doing, that she was mentally competent to make a will and was acting of her own free will and not under undue influence.
 [1] There are only inferences, and perhaps presumptions, to contradict this testimony. These inferences and presumptions are not conclusive and while they might have created a conflict in the evidence, that conflict was resolved against contestants by the trial court. Of course conflicts in the evidence are settled in the trial court and a judgment may not be reversed because of such conflicts, where, as here, there is material and substantial evidence supporting the findings and judgment.
 [2] Undue influence must overpower the will of the testatrix so that the will of another is substituted for hers. (Estate of Bryson, 191 Cal. 521 [217 P. 525]; Estate of Shay, 196 Cal. 355 [237 P. 1079]; Estate of Smith, 200 Cal. 152 [252 P. 325]; Estate of Finkler, 3 Cal.2d 584 [46 P.2d 149].) Instead of leading us to the conclusion that the two nephews had overpowered the will of Mrs. McCollum and substituted their testamentary desires for hers, a study of the record indicates that the will was the result of the free and voluntary act of Mrs. McCollum. Mrs. Burger did not know the will *750 was being executed so no charge of undue influence can be directed at her.
 The evidence on the question of the mental capacity of Mrs. McCollum to execute a will is hopelessly conflicting. The witnesses for contestants were of the opinion that Mrs. McCollum was incompetent and the majority pictured her as a person entirely without understanding. Two of those witnesses, Mrs. Cordrey and the nurse who cared for Mrs. McCollum, after testifying that she could only mumble and use monosyllables, detailed conversations with her, thus in effect impeaching themselves. One of these conversations pertained to the title to real property and the witness, after reciting the conversation, explained that Mrs. McCollum had carried on her part of it largely by means of gestures. The trial judge, in commenting on this evidence, remarked that even a learned professor of law might have great difficulty in describing an estate in real property by means of gestures. If the explanation be assumed to be true, it would indicate that Mrs. McCollum had developed the art of pantomime to a high degree, exceeding the capabilities of the ordinary person.
 [3] Contestants produced the only doctor who testified in the case. He was general practitioner and testified that in his opinion Mrs. McCollum was incompetent to make a will. While this opinion was entitled to be carefully weighed by the trial judge it was not conclusive on the subject, (Estate of Arnold, 16 Cal.2d 573 [107 P.2d 25]), and like the evidence of any other witness could be rebutted by other satisfactory evidence.
 [4] The will was executed on January 26, 1939, and the next day Mrs. McCollum was adjudged to be "unable, unassisted, properly to manage and take care of herself and her property" and guardians of her person and of her estate were appointed.
 It is urged that this is strong evidence of mental incompetence on the day before. This was evidence to be weighed and considered by the trial court. As was said in Estate of Johnson, 200 Cal. 299 [252 P. 1049]: "Adjudication of incompetency in the guardianship proceedings did not necessarily mean that the decedent was of unsound mind at the time of such adjudications or that she was not then competent to make a valid will."
 A strong bit of evidence on the mental capacity of Mrs. McCollum is found in the record of the guardianship *751 proceeding. In her petition Mrs. Cordrey had alleged that Mrs. McCollum was mentally incompetent, and wholly incompetent to transact business. While there is no direct finding on this allegation it was negatived by the finding that by reason of old age, disease and physical infirmity Mrs. McCollum was unable, unassisted, to properly take care of herself and of her property. Further, Mrs. McCollum was interrogated by the judge before whom the guardianship proceedings were held and he inserted in his judgment the following: "And said Lulu A. McCollum, did, in open Court, request that Beatrice Burger be appointed such guardian."
 The judge had a number of years experience on the bench. He was trained by experience to observe witnesses and weigh their testimony. The question of mental competency was an issue before him. Had his interrogation of her, and her answers to his questions, raised any suspicion in his mind of her mental incompetency, he certainly would not have acted on her request nor would he have incorporated in his judgment that request as a reason for the appointment of Mrs. Burger as guardian. Thus we have, by inference at least, the opinion of an entirely disinterested trial judge, a trained observer, to the effect that Mrs. McCollum was not mentally incompetent on January 27, 1939.
 No good could be accomplished by further reviewing the conflicting evidence on the question of competency. There is ample evidence to support the finding of competency, as there is sufficient evidence to support one of incompetency had it been made. Such conflicts are addressed to the trier of fact and cannot be settled in an appellate court.
 [5] Contestants urge that the trial court committed prejudicial error in excluding evidence that the property of Mrs. McCollum had its origin in the separate property of Mr. McCollum. As we have observed, we believe this sufficiently appears from the record so that further evidence on that subject would have been cumulative only. There was no prejudice in this ruling of the trial court.
 [6] Contestants called Mrs. Burger as a witness under the provisions of section 2055 of the Code of Civil Procedure. On objection of proponents they were not permitted to cross-examine her at that time. We may assume that this ruling was error and still cannot reverse the judgment because of lack of prejudice in it. Mrs. Burger was called as a witness by the proponents of the will and was cross-examined at *752 length by contestants. We have not found a single objection to any question propounded to her by counsel for contestants. Their cross-examination was not limited in any manner and they do not suggest what further facts they could have brought out had they been permitted to call her for cross-examination. The error, if any, was entirely abstract and no prejudice is shown to have resulted from it.
 We have considered the other questions raised by contestants and they do not possess sufficient merit for detailed consideration here.
 The judgment is affirmed.
 Barnard, P. J., and Griffin, J., concurred.