[Civ. No. 18065.    Second Dist., Div. One.    Oct. 16, 1951.]

Estate of WALTER E. HANNAM, Deceased. MARIE ANTOINETTE GRIFFITH, Petitioner and Respondent, v. MARIETTA HANNAM et al., Appellants; GRACE N. MACKEY, Legatee and Respondent.

David H. Cannon and Cannon & Callister for Appellants.

Charles E. McGinnis for Petitioner and Respondent.

Henry M. Lee for Legatee and Respondent.

HANSON, J. pro tem.—This is an appeal from a judgment entered by the trial court based upon its finding that the will presented by appellants for probate was executed by the testator as a result of the undue influence of his wife, one of the appellants herein. The only contention made here by appellants is that the evidence is insufficient to sustain the judgment.

The testator at the time of his death was 78 years old. He left surviving him his wife, to whom he had been married 53 years, a son named Harry, and two granddaughters, one named Dorothy, the daughter of Harry, and another named Maxine King, the adult daughter of a son who had predeceased the testator. For a period of 30 years prior to his death the decedent had operated a sheet metal and iron shop in Los Angeles. He left an estate derived largely from the business of a value somewhere between $35,000 and $80,000.

Early in 1947 decedent employed as a secretary a woman by the name of Grace Mackey. In May, 1948, he went to the office of an attorney to have a power of attorney drawn. He told the lawyer that Miss Mackey was his silent partner in his business and he wished to give her complete authority to manage his business affairs in his absence. Such a power of attorney was drawn and he executed it in August, 1948. On September 22, 1948, he sold his remaining partnership interest in his business to Miss Mackey for $1,000. The sale was evidenced by a bill of sale which was promptly recorded. At the same time he caused his attorney to prepare a will likewise dated September 22, 1948, which he duly executed. This will, which is not the will here involved but which was the will admitted to probate, made three cash bequests; one of $100 to his granddaughter Maxine King, another of $100 to his son Harry and still another of $1,000 to his secretary and partner. All the rest of his property he bequeathed to his wife for life with the remainder to a trustee who was to pay the sum

of $100 per month to his son during his life and $50 per month to his granddaughter Maxine King during her life and upon the death of the last of these beneficiaries the remainder was to pass to his secretary, if she was living, otherwise to his granddaughter Dorothy.

Late in January, 1949—about four months after the transactions above narrated—decedent was suddenly taken ill. At the hospital his case was diagnosed as being that of cancer. The will which is here involved which left all his property outright to his wife was executed by the decedent in a sanitarium to which he had been removed. The facts so far stated are undisputed. We pass now to relate further facts which the court upon the evidence and all proper inferences therefrom could have found to be true facts.

The decedent was proud of the business he had established and was anxious to see it carried on under the name he had given it. His son Harry took no interest in the business and the son's endeavors to establish himself in other kinds of businesses had not only been unsuccessful but had caused the father to lose money. As a result of this and primarily because of the son's excessive use of liquor the father and son were not on good terms. The testator's wife, however, always sided with her son and as a consequence he preferred his business to his home. He referred to the latter as being merely a place to sleep. In 1947, as stated, he employed Grace Mackey as his secretary. She quickly impressed him as being able to carry on the business, whereas his son could and would not do so. Notwithstanding the fact that he appears to have resented his wife's contrary attitude toward their son, he nevertheless was anxious to adequately provide for her upon his death, but at the same time he wished to safeguard her against the son for fear the latter would get the estate away from her. When in 1948 he employed an attorney to draw his will he did not consult with his wife nor did he thereafter advise her he had executed his will. Coincident with the execution of this will he left a letter directed to the members of his family which was entrusted to his executor named in the will for delivery to his family upon his death. This letter explained the reasons which actuated him in drawing the will as it was drawn.

While the decedent was in the sanitarium his wife learned from conversations with his secretary that the latter claimed not only that she had purchased his business but that the testator had made a will in which the secretary was named as one of the beneficiaries. Upon learning these facts the wife

concluded that she was entitled not only to the business, but to his estate as well. Accordingly, she had a conversation with her husband about the matter suggesting, so she testified, that she was entitled to his property and that he should make a will to that effect. Her testimony is that he agreed to do so. She then got in touch with her son's wife and between them it was arranged that the daughter-in-law, who was employed at a bank, would arrange to have a will drawn giving the testator's wife all his property including his business and that the daughter-in-law would provide witnesses for the will. The will was promptly prepared at the bank and two bank employees—coemployees of the daughter-in-law—appeared at the sanitarium with it and handed it to the testator's wife. She read it over and handed it to her husband who signed it. At the time the decedent was in great pain and even the testator's wife testified that at the time she questioned in her own mind whether he was in a condition to sign the will and thought that perhaps the will should be rewritten and executed anew.

It should also be stated at this point that just six days before the will was executed decedent's wife and his daughter-in-law appeared at his room at the sanitarium with a woman notary—employed at the bank where the daughter-in-law was also employed. The notary testified that decedent's wife handed him two documents; that he signed both and she then notarized them. He said nothing to her, nor did she say anything to him. She further stated that the other women—the two Hannams—conversed, but what they said she did not recall nor did she recall whether the documents were read by the decedent. From her testimony the inference was strong that he did not read them. The two documents were duplicate revocations of the power of attorney decedent had given Miss Mackey. Not only did the documents contain revocatory provisions but likewise they recited he was the owner of the business and that Miss Mackey had paid him nothing for the business. In addition it contained a demand directed to Miss Mackey to surrender the business to Hannam's son and a grant to the latter to take over the business.

Without detailing further the facts surrounding the execution of the will we are of the view that the trial judge was entirely justified in ruling that the will was executed by virtue of the undue influence of his wife.

■ "The theory which underlies the doctrine of undue influence is that testator is induced by various means, to

execute an instrument which, although his, in outward form, is in reality not his will, but the will of another person which is substituted for that of testator. Such an instrument is, in legal effect, not a will at all.'' (1 Page on Wills, 3d ed., § 184, pp. 368, 369; see, also, *Estate of Newhall*, 190 Cal. 709 [214 P. 231, 28 A.L.R. 778]; *Estate of Hinde*, 200 Cal. 710 [254 P. 561].) ▮ Direct evidence as to undue influence is rarely obtainable and hence a court or jury must determine the issue of undue influence by inferences drawn from all the facts and circumstances. Taken singly the facts or circumstances may be of little weight, but taken collectively they acquire their proper weight and may then be sufficient to raise a presumption of undue influence. ''But it is not possible to say that any single circumstance or group of facts is the invariable mark of such a presumption, or that there is any uniform rule capable of application apart from the facts of each case.'' (9 Wigmore on Evidence, 3d ed., § 2503, pp. 364-366.) ▮ It is not necessary to prove any particular group of facts or circumstances, but rather to prove such as sufficiently sustain to a reasonable mind a fair and proper inference of undue influence.

▮ In the case before us the wife stood in a confidential relationship; the will as drawn did not accord with a will of the character which she said he had agreed to sign. According to her testimony he agreed to leave all his property to her but nothing was said to the effect that his son was to take the entire estate if the wife should predecease the testator. The will as drafted was manufactured, innocently or otherwise, by the wife to carry out her wishes and expressed desires which had not been enunciated to her by the testator, i.e., that the son should take the entire estate if his mother predeceased him. Moreover, the will was contrary to the consistent attitude he had taken toward his son and to his granddaughter Maxine King as evidenced by his oral statements and by his earlier will. It was for the trial court, and it is not for us, to weigh the evidence.

As the rules applicable to the facts of the case are so well established in this state we see no need to state in detail the cases which do and do not apply to the facts or to distinguish one case after another which has been cited to us. It is enough for us to say that after a detailed review of the record, we find no error in the judgment rendered below.

The judgment is affirmed.

White, P. J., and Drapeau, J., concurred.