[41 C.2d 1; 256 P.2d 984]

[L. A. No. 22087. In Bank. May 8, 1953.]

Estate of ARTHUR C. JAMISON, Deceased. CHANCEY B. JAMISON, Respondent, v. FRANCES JAMISON JOHNSON, as Guardian etc., et al., Appellants.

4

Frederick W. Mahl, Jr., Edward Alton, Frank M. Sturgis and Allan F. Bullard for Appellants.

Church, Church & Howard and Charles H. Church for Respondent.

CARTER, J.—Chance Jamison, respondent here, petitioned for probate of the holographic will,* dated December 31, 1949, of Arthur C. Jamison, his father. California Trust Com-

---

*''Dec 31-49

''I hereby revoke all past wills—codicils by me made—declare this is my last will—I give ~~it~~ all my properties to my four heirs as follows—

| | |
|---|---|
| Lea Patterson | 2% |
| Frances Johnson | 5% |
| Chance Jamison | 85% |
| Louise Jamison | 8% |

''I appoint Chance Jamison as Executor of my will without bond

A. C. Jamison''

pany petitioned for the probate of a witnessed will of the decedent, dated May 17, 1948. Frances Johnson, decedent's daughter, for herself and her two minor children; Leanore Patterson, another daughter of the decedent, her children, and Katharine Jamison, the divorced wife of respondent, filed oppositions to the probate of the holographic will. Louise Jamison, surviving widow of decedent, did not oppose it. Under the 1948 will, decedent had left $5,000 to each of his two daughters, to respondent, his son, and to his brother Roy; $15,000 to his wife, Louise; $50,000 to Katharine Jamison; and the residue to his grandchildren. In the 1949, or holographic will, *supra*, he left 2 per cent of his estate to his daughter, Leanore Patterson, 5 per cent to his daughter Frances Johnson, 8 per cent to his wife Louise and the balance of 85 per cent to respondent, his son. The 1949 will revoked previous wills. Decedent left an estate of a stipulated value of $237,000.

The grounds of contest of the probate of the holographic will were: (1) That it was not written and signed by decedent; (2) that it was executed under the undue influence of respondent; and (3) that the decedent was mentally incompetent to execute it. Contestants abandoned the first ground on this appeal, leaving only the last two. The case was tried by the court without a jury.

At the close of contestants' case, respondent moved for a nonsuit on each and all of the grounds of contest. The court granted the motion as to the first two grounds and denied it as to the third, mental capacity. The judgment at the close of the case concluded that decedent had executed the 1949 will, having the mental capacity to do so, had not then acted under undue influence, and that the will was entitled to probate. Contestants appeal from that judgment.

The propriety of granting a motion for a nonsuit as to some of the grounds of contest and denying it as to others is doubtful when we speak of nonsuit in its true meaning. That is so because ordinarily a judgment of nonsuit is on the merits (Code Civ. Proc., § 581c), is considered a final disposition of the case and is appealable. (3 Cal.Jur.2d, Appeal & Error, §§ 50, 39.) A nonsuit as to some of the grounds of contest does not dispose of the whole case but only disposes of a portion of it. Thus there would be the possibility of two judgments in the same case (the one of nonsuit and another judgment at the close of the case on issues as to which a nonsuit had been denied) when the general rule is that there

should be only one judgment. (3 Cal.Jur.2d, Appeal & Error, § 40.) This would raise the question of whether it would be necessary to appeal from the first judgment of nonsuit on some of the grounds of contest. Further difficulties appear when we note that in reviewing a judgment of nonsuit, the test applied by the appellate court is whether, according to plaintiff (contestants) the benefit of all favorable evidence together with inferences therefrom, it is sufficient to make a case, while if the trial court sitting without a jury, passes upon the weight of the evidence, even though the only evidence produced be that of plaintiff, and gives judgment for defendant, the rule on review is that the evidence must be viewed most favorably to defendant. In a case tried to a jury the proper procedure, rather than granting a motion for nonsuit on some of the grounds, would be for the court to instruct the jury to find for proponent on the issues upon which it thought a nonsuit would be proper. (See *Estate of Hewitt,* 63 Cal.App. 440, 444 [218 P. 778].) What was done in the instant case should not be considered as a true nonsuit. Rather the respondent, proponent of the will, by his motion for a nonsuit, in effect said to the court, "I do not wish to put on any evidence to answer that produced by contestants for I do not think their evidence is sufficient as a matter of law to make a case on the first and second grounds and I am willing that the court decide these issues on that basis—as a matter of law, and refrain from weighing the evidence." The findings of fact made after all the evidence was in, show that is what happened here because the trial court did not make a finding on the issue of undue influence, the second ground of contest, but, in its judgment, stated its conclusion that decedent was not acting under undue influence. We take that to mean that, as a matter of law, the court felt that the evidence on that issue was not sufficient; that it had not purported to weigh the evidence on that issue. Therefore on that issue the scope of review must be the same as that on a nonsuit, while on the finding of mental capacity the test is whether there was sufficient evidence to support the finding.

Contestants' main contention is that the evidence when viewed most favorably to them is sufficient to establish undue influence and that the evidence is insufficient to support the finding of mental capacity.

Turning first to the question of undue influence there is evidence from which the following appears: The testator died on February 11, 1950, at the age of 83, a month and 11 days

after he made the 1949 holographic will. He had been married twice, his first wife having predeceased him. He left, surviving him, his second wife, Louise; his son, respondent here, and his wife, Esther; Katharine Johnson, divorced wife of respondent, and Jeanne, their daughter; Leanore Patterson, another daughter, and her four children, Jean, Patricia, Virginia and Robert; Frances Johnson, another daughter, and her two children, Franklin and Jacqueline; Clare and Roy Jamison, his brothers.

The testator had not been actively engaged in business since 1930, except as to the investment of his money. He had been well until the onset of the illness in May, 1949, which culminated in his death. He was a family man and took an active interest in his children and grandchildren. His first wife died in 1945, and he married his surviving widow in 1948. Respondent and his father, the decedent, had been estranged for many years, the latter being displeased with the way his son conducted his life and felt that he was "no good." The testator had been a person of strong character tending toward domination as the head of his clan. At the onset of his last illness, he had adamantly maintained that he would not go to a hospital and had remained at home for a week. After he entered the hospital on May 20, 1949, he became "docile." At the hospital he had a daily fever, his gall bladder was diseased, he was anemic, and a heart ailment required medication and oxygen. He was suffering from arteriosclerosis and senile dementia. He was mentally confused and showed it in his actions. He could not add figures, indicating, contestants assert, that he could not have computed the percentages in the holographic will. His personal physician testified that he was of unsound mind on December 31, 1949, the date of the holographic will. He left the hospital and returned to his home where he remained until his death on February 11, 1950, still suffering from his various ailments and under constant nursing care.

 There is thus a showing that decedent was in such a mental condition on December 31, 1949, when the will was purportedly executed, that he would be easily influenced; that being estranged from respondent, his son, and being fond of his grandchildren and daughters and his son's first wife, it would not be probable that he would leave most of his estate to respondent. There were aspects of unnaturalness and undue profiting by respondent under the 1949 will, by which he received much more than he did under the 1948

will. These are all factors bearing upon the issue of undue influence. (*Estate of Teel,* 25 Cal.2d 520 [154 P.2d 384] ; *Estate of Lingenfelter,* 38 Cal.2d 571 [241 P.2d 990].) Of course, standing alone, these factors are insufficient to establish undue influence. The proponent must also be active in procuring the execution of the will. (*Estate of Teel, supra,* 25 Cal.2d 520 ; *Estate of Lingenfelter, supra,* 38 Cal.2d 571.)

■ Such activity may be established by inference, that is, circumstantial evidence. (*Estate of Abert,* 91 Cal.App.2d 50 [204 P.2d 347] ; *Estate of Hannam,* 106 Cal.App.2d 782 [236 P.2d 208] ; *Estate of Leahy,* 5 Cal.2d 301 [54 P.2d 704] ; *Estate of Sproston,* 4 Cal.2d 717 [52 P.2d 924] ; *Estate of Kilborn,* 162 Cal. 4 [120 P. 762] ; *In re McDevitt,* 95 Cal. 17 [30 P. 101] ; see cases collected 26 Cal.Jur. 760-761.)

■ In the instant case, according to respondent's testimony under section 2055 of the Code of Civil Procedure, the will which was dated December 31, 1949, was handed to him by decedent on February 7, 1950, 38 days after its date and 4 days before his death. This occurrence took place in decedent's home while respondent was visiting him, although the decedent did not say, and respondent did not know, that what was handed to him was a will. Decedent said he did not have long to live, handed him the will and cautioned respondent not to show it to anyone. Respondent did not know when the will was executed. On this review, guided by the same principles as pertaining in a nonsuit, the portion of such testimony favorable to contestants must be accepted and that which is unfavorable rejected. The fact remains that when the testator died, respondent had possession of the will and offered it for probate.

There is evidence that respondent had an interest or motive in having a will executed which would give him the major share of the estate and that he had the opportunity to exercise undue influence. In connection with the matter of opportunity, it appears, according to respondent's testimony, that he visited his father frequently when he was ill in the hospital, made almost daily visits after he had returned home and that he was with his father several hours on December 31, 1949, the date of the will, a part of which time he was with his father alone.

In addition to the foregoing, contestants point to other circumstances shown by the evidence: that decedent had a great regard for his grandchildren, respondent's divorced wife, and his children, with the exception of respondent, who he

felt was "no good"—no son of his. (Decedent left respondent $5,000 by the 1948 will as compared with 85 per cent of his estate by the 1949 will which made no provision for his grandchildren or respondent's divorced wife.) In May, 1949, Frances Johnson, respondent's sister, told him that he was to receive $5,000 under the 1948 will and his divorced wife was to get $50,000. Later he was similarly advised and he stated he was going to break the will. About August 1, 1949, Frances and respondent were in Attorney Arkoff's office discussing the matter of having Frances appointed guardian of decedent's estate and the testamentary disposition of his property. Arkoff said decedent could make a will even though a guardian was appointed and he explained how a holographic will was made and executed. From this it may be inferred that respondent was inquiring about that kind of a will although he had said he was not there to discuss wills. Respondent spoke to the testator and others about the testator's making a new will (different from the 1948 will). On two occasions, once while decedent was in the hospital, and once when he was at home (September, 1949), respondent handed a will in his own handwriting to his father for his signature. This proposed will bequeathed the estate to decedent's three children and revoked all previous wills. When it was handed to decedent he said he would see about it and laid it aside. Respondent then replaced it in his pocket. As above seen, respondent was a constant visitor to his father after his illness although they had previously been estranged. Respondent's second wife had formerly been a legal secretary, and secretary to Giannini of the Bank of America, where she may have acquired some legal knowledge. As far as appears, respondent was the only person who knew of the 1949 will until after decedent's death. After his father's death, respondent had the bank's representative show him the 1948 will without divulging his possession of the 1949 will. Later he delivered the 1949 will to his attorney. From this, it is asserted, that it may be inferred he was afraid to use the 1949 will because he knew it was invalid and would not have done so if he had found the 1948 will to be favorable to him.

Contestants point out that the will is so concise and legally complete that it is unreasonable to believe that the testator, in his weakened condition, could have prepared it of his own volition; that he was mentally incapable of listing the percentage each legatee would receive so that the various percentages would total 100 per cent, or his entire estate. Also,

the appearance of the writing in the will itself shows it must have been a laborious task for the writer.

Finally it is claimed that the relationship between testator and respondent, that of father and son, is a fiduciary relationship which is a factor in the question of undue influence, citing *Estate of Eakle,* 33 Cal.App.2d 379 [91 P.2d 954]. To that case may be added *Robins* v. *Hope,* 57 Cal. 493, 497 and *Bacon* v. *Soule,* 19 Cal.App. 428, 434 [126 P. 384].

However, this court said in *Estate of Lingenfelter, supra,* 38 Cal.2d 571, 585: ''Consanguinity of itself does not create a fiduciary relationship.'' It is, however, some evidence of a fiduciary relationship. (*Estate of Llewellyn,* 83 Cal.App.2d 534, 562 [189 P.2d 822, 191 P.2d 419].) While there is evidence that respondent and his father had been estranged, there is also evidence that after his father became ill and for several months thereafter he had conscientiously visited his father. The decedent thought he was a good son and liked him, discussed his affairs with him and gave him papers dealing with finances to examine. From the father and son relationship and that evidence it could be inferred that a confidential relationship existed.

There is conflict in the evidence concerning many of the foregoing circumstances as well as in the inferences which may be drawn from them but, as seen, the sole question is whether the evidence most favorable to contestants was sufficient as a matter of law to establish undue influence, and the conflicts must, therefore, be disregarded.

The general rule is as stated in *Estate of Teel, supra,* 25 Cal.2d 520, 528: ''. . . where such fiduciary relationship is combined with unduly profiting by the will, and its being unnatural, and activity on the part of the proponent in procuring its execution, we have persuasive evidence of undue influence.''

While generally it is not fruitful to compare factually other will contest cases because of the variation in existence and degree of the factors involved, nevertheless *Estate of De Laveaga,* 165 Cal. 607 [133 P. 307] is quite persuasive. There the testatrix was of weak mind (retarded development), had lived for many years with her sister and her sister's husband who had made all of her decisions for her. It was there held that the relationship was a fiduciary one. The will there involved was holographic and precise in its form. The testatrix left the bulk of her estate to her sister and only a small share to her brother who contested it. According to the testimony

of the sister-proponent, and her husband, on the date of the will, the testatrix called them to her room and showed them the will which she said she had written. The testatrix signed it in their presence and handed it to the sister who kept it until testatrix' death. The sister testified that they had exercised no influence. The probate court found in favor of the contestant on the grounds of unsoundness of mind and undue influence. This court affirmed the probate court on both grounds, stating: "The evidence is likewise amply sufficient to sustain the finding of undue influence. Of course there can be no claim that the evidence does not sufficiently show the relation of trust and confidence between the deceased and the Cebrians, and the complete and perfect control of the deceased by them. There was certainly sufficient proof of interest and opportunity. The claim of learned counsel in this regard is that there was no proof that any undue influence was brought to bear directly upon the testamentary act. It is well settled that 'undue influence, . . . must in order to avoid a will destroy the free agency of the testator at the time and in the very act of the making of the testament. It must bear directly upon the testamentary act' (*Estate of Higgins,* 156 Cal. 261 [104 P. 8] ; 'there must be substantial proof of the pressure which overpowers the volition of the testator at the time the will was made.' (*Estate of Ricks,* 160 Cal. 461-462 [117 P. 537].) And to warrant the setting aside of a will on this ground there must of course be substantial evidence of the exercise of undue influence on the testamentary act. 'Substantial evidence must do more than raise suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proved which are inconsistent with the claim that the will was the spontaneous act of the alleged testator.' (*Estate of Ricks,* 160 Cal. 462 [117 P. 537].) And it is said that the only evidence as to the execution of this will was that given by Mr. and Mrs. Cebrian, and that this evidence shows without conflict that there was nothing in the way of influence, undue or otherwise, attempted to be exerted upon deceased in the matter. But the court was not bound to accept as true the testimony of the Cebrians in this regard. If it was sufficiently made to appear that the deceased was absolutely incompetent to understandingly and intelligently consider her property with a view to its proper disposition, and alone and unaided to compose and write the paper offered for probate as her

will, to warrant the trial judge in so concluding, as we have seen is the fact, we have substantial proof of undue influence bearing directly upon the testamentary act; and in view of the testimony of Mr. and Mrs. Cebrian that they were the only persons present at the time of the execution of the will, taken in connection with the other matters to which we have referred, it is certainly a reasonable, if indeed not an irresistible, inference, that whatever undue influence was in fact exerted, was exerted by one or the other or both of them. In addition to the matters already stated as being shown by sufficient evidence, it is proper to note that the evidence shows that Mr. Cebrian was a man of education, and one with a considerable knowledge of law and legal forms; and also that the alleged will indicated on its face that insofar as the actual writing was concerned it was a laborious effort. As said by the learned trial judge: 'It is quite plainly the product of much manual exertion. If she was not following copy or taking dictation, she was certainly engaged in hard work in the writing of this will; it is not an example of fluency in penmanship nor of accuracy in spelling.' It is also proper to take into consideration the improbability that deceased if she was of sound and disposing mind and memory, and not acting under undue influence, would have so discriminated against her brother, who, in the language of the trial judge 'had been a great service to her for many years and who had conserved her estate without the diminution of a dollar, indeed with increase and without retaining anything for personal benefit,' and of whom, as the evidence shows, she was very fond.'' (*Estate of De Laveaga, supra,* 165 Cal. 607, 622.) ▮ From the foregoing discussion and authorities it appears that there is sufficient evidence on the issue of undue influence to support a finding in favor of contestants and the judgment of nonsuit on this issue must, therefore, be reversed.

On the issue of unsoundness of mind, there is testimony by many witnesses, including several doctors, who were attending decedent, that the latter was of unsound mind and did not know of what his property consisted on the date (December 31, 1949) stated in the 1949 will and at other times near that date. A guardian was appointed for decedent in late July or August of 1949, on the ground that he was incompetent to handle his affairs. The trial court found, nevertheless, that the testator was of sound mind and competent to make the will.

If there is any substantial evidence to support that finding it cannot be disturbed even though there is a sharp conflict in the evidence and abundant evidence to support a contrary conclusion. (*Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689]; *Estate of Teel, supra,* 25 Cal.2d 520.) And there is a presumption that the testator was sane—of sound mind—which the contestants must overcome. (*Estate of Lingenfelter, supra,* 38 Cal.2d 571.) The opinion of the doctors who attended decedent in his last illness that he was suffering from senile dementia and thus was of unsound mind when the will was made is not conclusive on the issue of competency. (*Estate of McCollum,* 59 Cal.App.2d 744 [140 P.2d 176]; *Arais* v. *Kalensnikoff,* 10 Cal.2d 428 [74 P.2d 1043, 115 A.L.R. 163]; 20 Am.Jur., Evidence, § 1211; *Estate of Sandman,* 121 Cal.App. 9 [8 P.2d 499].) Incompetency to make a will is not necessarily established by the fact that decedent was adjudged an incompetent in a guardianship proceeding. (*Hellman Commercial T. & S. Bank* v. *Alden,* 206 Cal. 592 [275 P. 794]; *Estate of Loveland,* 162 Cal. 595 [123 P. 801]; *Estate of Johnson,* 57 Cal. 529; *Jensen* v. *Jensen,* 84 Cal.App.2d 754 [192 P.2d 55]; see *In re Zanetti,* 34 Cal. 2d 136 [208 P.2d 657].)

Opposed to contestants' evidence is the testimony of several witnesses, including the respondent, that testator was of sound mind on the date borne by the 1949 will and on prior and subsequent occasions. This testimony recounted the rational behavior of decedent and showed that he was in possession of his faculties. Also, the will itself bears mute evidence of testator's competency. The conflict was resolved by the trial court which weighed the evidence and its conclusion is binding on this appeal.

Contestants contend that the judgment is erroneous in that it did not order the 1949 will admitted to probate. Section 373 of the Probate Code provides that in a will contest before probate upon proof taken by the court where a jury is waived, the court must render "judgment either admitting the will to probate or rejecting it." Here the judgment states that the 1949 will is "entitled to be admitted to probate" rather than that it is admitted to probate. On the same day, the court made an order admitting the will to probate. No appeal was taken from that order. On respondent's motion to dismiss the instant appeal, the District Court of Appeal held that an order admitting a will to probate is not

proper after judgment following a contest before probate and that the judgment should order the will admitted to probate but it reserved the question as to the claimed error in the judgment to be decided when the appeal was decided on the merits (*Estate of Jamison*, 107 Cal.App.2d 483 [237 P.2d 546]). It is clear that the judgment substantially complies with section 373 of the Probate Code. When it declared that the will was entitled to be admitted to probate nothing remained to be done. Although it could have been worded more precisely we find no substantial error.

Contestants assert the court erred in awarding costs to respondent, proponent of the 1949 will. The statute states: "When not otherwise prescribed by this code or by rules adopted by the Judicial Council, either the superior court or the court on appeal, may, in its discretion, order costs to be paid by any party to the proceedings, or out of the assets of the estate, as justice may require." (Prob. Code, § 1232.) That section applies to will contests before probate. (*Estate of Jones*, 166 Cal. 147 [135 P. 293]; *Estate of Bump*, 152 Cal. 271 [92 P. 642].) However, the court should not exercise its discretion and award costs until the final determination of the contest. Thus it should not make an award where an appeal is taken. (*Estate of Hart*, 107 Cal.App.2d 58 [236 P.2d 891]; *Estate of Jones, supra*, 166 Cal. 147; *Estate of Berthol*, 163 Cal. 343 [125 P. 750]; *Henry* v. *Superior Court*, 93 Cal. 569 [29 P. 230]; *Estate of Johnson*, 198 Cal. 469 [245 P. 1089], 200 Cal. 307 [252 P. 1052]; *Estate of Wallace*, 12 Cal.2d 476, 481 [86 P.2d 95].) Here the contest is not ended for, as appears, there must be a new trial on the issue of undue influence.

The judgment is affirmed insofar as it determines decedent was competent when the 1949 will was made. It is reversed insofar as it determines that there was no undue influence and remanded for a new trial on that issue. The portion allowing costs is reversed.

Each party shall bear his own costs on this appeal. (See Rules on Appeal, rule 26(a).)

Gibson, C. J., Shenk, J., Traynor, J., and Schauer, J., concurred.

EDMONDS, J.—Recently, this court reiterated the long established rule that "(t)o overturn a will on the ground of undue influence, not only must there be evidence of activity

on the part of the beneficiary, it also 'is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. . . . Evidence must be produced that pressure was brought to bear directly upon the testamentary act . . . mere opportunity to influence the mind of the testator, even though coupled with an interest or motive to do so, is not sufficient.' " (*Estate of Lingenfelter*, 38 Cal.2d 571, 586 [241 P.2d 990].)

The activity must be of such a nature that it "overpowered the mind and bore down the volition of the testator at the very time the will was made." (*Estate of Carithers,* 156 Cal. 422-428 [105 P. 130].) Moreover, it must be proved by evidence in addition to that tending to establish such other factors as unnaturalness of the will, motive by the proponent, and susceptibility to influence on the part of the testator. As I read the record in the present case, there are no facts from which such conduct reasonably may be inferred.

The evidence relied upon by the contestants as giving rise to such an inference shows only motive, unnaturalness in the will, or the testator's susceptibility to influence, factors which do not replace but are in addition to the requirement that the proponent's activity in procuring the will be shown. Other facts are mentioned in the majority opinion, but it is not held that they are sufficient to support an inference of activity which invalidates the testamentary document. *Estate of De Laveaga,* 165 Cal. 607 [133 P. 307], is said to be "quite persuasive" of the conclusion reached but the facts of that case clearly distinguish it from the present situation.

There, from childhood, the decedent had been incapable of carrying on her own business affairs, entrusting all of such matters to her brothers and sisters. Her sister, the proponent of the will, directed all of her activities, the decedent obeying without protest. Her mind was that of a child, "unable to comprehend anything beyond the most simple matters." It was found specifically that she was incompetent mentally to execute a will.

In addition, it was shown that the decedent had no knowledge of the nature or value of her property, but the will was explicit in designating items and amounts. The proponent and her husband, who with others managed her business affairs, were alone with the decedent at the time the will was executed. There was evidence that she signed any and all papers which they presented to her, without inquiry as to their nature and effect, and "she never indicated her ability

unaided to compose and write any paper beyond the simplest and most childish messages, the few writings of any other character shown, exclusive of the alleged will, having been produced with great and laborious effort and under such circumstances as to indicate the aid and assistance of others.'' (P. 621.)

Here, the evidence viewed most favorably to the contestants shows only the following facts: Prior to the execution of the will, Chance Jamison, each time in the presence of at least one other person, sought twice to have the testator revoke a previous will and execute a new one dividing the estate among the children. Chance knew how to prepare a holographic will. The mind of the testator was weak, but not to such an extent as to justify a finding of mental incompetency. The testator prepared a will which was concise and legally complete, the appearance of which ''shows it must have been a laborious task for the writer.'' Chance and his wife visited the testator on the day the will was executed, being alone with him part of that time; the rest of the day he was either alone or in the company of various other persons, no evidence being offered as to the time of day the will was executed.

The most that can be said for this evidence is that it shows a possible desire and opportunity to influence the testator to prepare a new will. But to say that from such evidence it may be found that the proponent ''overpowered the mind and bore down the volition of the testator at the very time the will was made'' is to permit the will to be overturned, not upon proof, but upon speculation.

I would affirm the judgment in its entirety.

Spence, J., concurred.

Respondent's petition for a rehearing was denied June 4, 1953. Edmonds, J., and Spence, J., were of the opinion that the petition should be granted.