[Civ. No. 22704. Second Dist., Div. Two. Jan. 22, 1958.]

WILBURN SMITH, JR., Appellant, v. SECURITY-FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association), as Executor, etc., Respondent.

*Assigned by Chairman of Judicial Council.

Robert E. Krause and Walter Desmond, Jr., for Appellant.

Leslie L. Heap for Respondent.

KINCAID, J. pro tem.*—Appeal is taken from a judgment for defendant in an action based upon an amended complaint for quasi-specific performance of oral contract; for constructive trust and to make the executor a constructive trustee of an estate for intended beneficiary-plaintiff and to impose an equitable lien on the estate.

Decedent, Wilburn Smith, Sr., died April 6, 1954  A will and codicil thereto were admitted to probate with assets in the estate of over $400,000. On November 3, 1954, plaintiff Wilburn Smith, Jr., the natural son of decedent, filed a creditor's claim for $75,295.88, plus interest. This represented a claimed indebtedness owed him by his father of $41,279.34 plus interest covering many years.

On September 3, 1955, plaintiff filed his complaint against the estate ''For Money'' based on his creditor's claim. This case went to trial but objections were made to the admissibility of certain evidence and the cause was put off calendar with leave to plaintiff to amend. The present amended complaint followed.

In 1911 an ancestor of plaintiff's mother, Laura A. Kittle, created a substantial trust in Michigan which provided that ultimately equal portions were to go to her then seven living children or any that might later be born. Decedent later married plaintiff's mother and plaintiff was born of this union. The trust authorized payment to the minor children of at least one half of the minor's share of the trust income as the trustee shall deem for the best interest and welfare of the minor and for his care, maintenance and education.

During her marriage to decedent, Laura A. Kittle followed a practice of advising the trustee each year of the amount expended for the care, maintenance and education of the minors, including plaintiff, and the trustee then reimbursed her.

After she died in 1928 decedent remarried and continued the practice of submitting detailed statements of expenditures to the trustee for reimbursement from plaintiff's share of the income.

When plaintiff came of age in 1943 decedent filed a final

*Assigned by Chairman of Judicial Council.

account as his guardian and plaintiff approved this account in writing, as did the court.

Six years later, in 1949, plaintiff filed a petition to review this account and a separate suit against decedent and others for reimbursement of the moneys collected for him through the trust. On May 5, 1950, demurrers were sustained without leave to amend as to the petition and with leave as to the suit. On the same day, written dismissals were signed and on June 28, 1950, were filed whereby both the petition and the action were dismissed with prejudice by plaintiff and his attorney. On this latter date decedent executed an affidavit for final discharge as guardian of the estate of plaintiff and was thereupon discharged by court order.

The theory of the plaintiff is that these dismissals were made because of a claimed oral agreement with his father, the decedent, that if plaintiff would dismiss the two legal proceedings, decedent would make a will or a codicil to a will which would reimburse plaintiff out of decedent's estate for all moneys received from the trust, being about $41,279.34, plus interest at 7 per cent from January 27, 1943.

The theory of defendant is that no such agreement was ever made and that plaintiff knew these proceedings could not be successfully prosecuted; that his father was annoyed by them, and that if pursued, plaintiff would be cut out of his father's will; that to avoid this he dismissed them.

Decedent died on April 6, 1954, leaving a will and codicil under which plaintiff is a beneficiary. The will was dated November 5, 1948, executed several years in advance of the claimed oral agreement. The codicil was dated January 29, 1954, about four years subsequent. The codicil gave plaintiff certain items of personal property as bequests. Neither will or codicil mentioned any reimbursement of the trust moneys to plaintiff.

On conflicting evidence the trial court found for defendant. It was found that in early May 1950 a conference was held between a Dr. Walter M. Ost as an intermediary, plaintiff and decedent, for the purpose of trying to reconcile father and son and to settle and terminate the litigation between them which was then pending. In that conference they were reconciled and an oral agreement was entered into by and between them, the import and effect of which was that if said litigation was dismissed, the father would provide for the son a measure of inheritance, devise and bequest at least equivalent in value to all sums which the father had received of the

son's property derived from the trust. That in reliance thereon plaintiff filed his dismissals and decedent executed an affidavit for his final discharge as guardian of the estate of plaintiff. That on his death, the father's estate had an appraised value of about $400,000 but that no evidence was offered at the trial to prove the value of the beneficiary interest of plaintiff therein to enable the court to determine whether the amount bequeathed plaintiff was or is the equivalent in value to all sums received by decedent from the trust.

Plaintiff contends that the evidence is insufficient to support the court's finding that an oral agreement was entered into in May 1950 between plaintiff and decedent, the import and effect of which was that if the litigation of plaintiff against the decedent was dismissed, the latter would provide in his will for plaintiff a measure of inheritance, devise and bequest at least equivalent in value to all sums which decedent had received of the plaintiff's property derived through the Michigan trust.

The testimony of plaintiff and of Dr. Ost is before us as to the conversations had at their conference with decedent in May 1950. Decedent's version of such conversations is precluded by his death. We find from the testimony of Dr. Ost that he and plaintiff were attendants of the same church and that he discussed with some church members the matter of the litigation existing between plaintiff and decedent. He then telephoned decedent asking if he would be willing to discuss the subject with the aim of a possible settlement and decedent indicated his willingness. An appointment was made and on May 3, 1950, they met for the first time. After discussion it was agreed that Dr. Ost might bring plaintiff with him for a meeting on May 7th. On that day decedent and Ost met and plaintiff was then brought into the room. Ost testified as to the ensuing conversations in part as follows:

"Q. Now, would you mind telling us what each one of them said, as near as you recall? A. I believe I introduced the matter in a few words, stating that I was happy to get a father and son together and to see that a lawsuit could be avoided, and then there was discussion as to what would happen. . . . Wilburn stated that he had been advised to seek settlement with his father. Dr. Smith stated that he appreciated this gesture by Wilburn and that he would settle the claim made by Wilburn in his will. He further stated that he was extremely happy that it was settled and would be settled, but that under no circumstances did he want us to

disclose the nature of this settlement to his wife because he didn't want to worry her. . . .

"Q. What, if anything did Wilburn Smith, Jr. say about the disposition of the suits you speak of? A. Wilburn, Jr. agreed to sign a Dismissal, I believe that is the correct term, of the suits upon the statements of his father. . . .

"Q. Well, at the time you had the conversation in his office with him did he refer at all to his other children? A. Yes.

"Q. Did he indicate to you that he would treat Wilburn the same as the other children, all as part of the family? A. In what respect are you speaking of now?

"Q. Well, as a member of the family, and so far as his will was concerned he would treat him as a member of the family. A. Not as a member of the family, because he told me that he didn't think it would be well for Wilburn to come up there with his stepmother. Is that clear to you?

"Q. This is not what I meant, but that he would be happy to treat Wilburn the same as the other children so far as being an object of his bounty, that he would provide for them? A. Yes, I believe that's right. When I say 'I believe that's right' I am not quoting any specific statement that I recall that he said.

"Q. Did he indicate or say to you that he would do that if Wilburn would treat him the same as the other children? Did he talk about Wilburn the same or equally with the other children and also about giving him something additional? A. He didn't discuss that matter with me.

"Q. But he indicated to you that he would take care of Wilburn in his will? A. He would take care of this suit, the matter of this suit, in his will.

"Q. And was there anything said to you about cutting Wilburn out of the will? A. No.

"Q. At any time? A. No. We were in a manner trying to fix things up. If that entered his mind he wouldn't talk about it.

"Q. You were trying to fix it so he would not cut him out? A. I had no knowledge whether he wanted to cut him out or anything else. I wasn't thinking about that particularly.

"Mr. Heap: Q. Well, at this conference over at the doctor's office when you were talking about getting these things settled was there anything said to the effect that the doctor would give Wilburn an equal share with the other children and also give him additional for some other reason?

"A. We didn't discuss this equal share business. The dis-

cussion was around the suit. Frankly, I wasn't too interested in any arrangement. I was interested in getting the father and son together. That was my prime purpose. That is what I was attempting to use my office to try to help these people get together and this other was just incidental, as far as I was concerned, but I happened to be there and heard these things and took part in it and that is the reason I am being 'called to testify to these things.' ''

After plaintiff left the room, Dr. Ost and decedent conversed as follows:

''A. We were both greatly relieved and I said to him, 'Doctor, you don't know how happy I am that a father and son have been reconciled,' and he said, 'You don't know what a worry this has taken off my mind.' . . . He said, 'I have stayed awake nights worrying about this thing,' and he told me that he couldn't talk with his wife about it and any man appreciates something like that, that he can't talk with his wife about it, it's a hard matter, and he was greatly appreciative of that and he further stated to me, he said, 'I will remember Wilburn in my will and I will make settlement to him for this suit in the will.'

''Now, let me just add a word there, Mr. Krause: In our conversation the settlement I am talking about is the settlement of this suit that Wilburn had against him and we did not mention figures because I did not know the exact figures. He gave me to understand that it would be a payment in the will to take care of the suit.''

On direct examination plaintiff testified in part:

''A. Well, my dad asked me if I would drop those lawsuits in Long Beach that I had against him if he would make restitution of the money that I had sued for in the will, and I said that I thought that was very fair, and I would.''

The cross-examination of plaintiff proceeded in part:

''Q. In reciting the conversation you used the word 'restitution' as coming from your father. Did he actually use that word? A. It was either 'restitution' or 'to restore to me.' It was either one or the other of those words. In other words, if I dropped these lawsuits he would make a will and restore this money to me, the moneys to me in the suit.

''Q. Did he say that he would restore to you the moneys that you claimed were due to you? A. We didn't go into amounts of money or anything like that, sir. That wasn't mentioned. In fact, the whole conversation didn't go into the merits of the cases or the amounts, or whether he was

right or wrong in what he did or how he felt about it in terms of value.

"Q. You are sure, are you, that he either used the word 'restitution' or that he said that he would 'restore' to you? A. It was specifically the moneys asked for in the suit, moneys that had been taken out of my guardianship estate, left me by my grandfather. We didn't talk about any other moneys of any kind.

"Q. Well, in this particular conversation was there any mention made by anyone about your claims, I mean, in detail? A. No, sir. Do you mean with Dr. Ost and he and I?

"Q. Yes. A. No, sir, there was not. Now, wait a minute. Let me qualify that, your Honor. I don't know what they talked about together. I am talking about when I was there. There had been a previous conversation. Dr. Ost came out and got me and I was in there, and all I know about what happened was when I was there.

"Q. Now, after you left his office on that day and before you filed the two dismissals that you have told us about, did you consult your lawyer about the matter of filing the dismissals? I do not want you to tell me what you or he might have said. I am simply asking you whether you consulted him before you filed the dismissal? A. Yes, and I would like to explain that. As I recall, Dr. Ost and I both went to his office and he asked us——

"Q. You have answered. You do not need to tell me what the lawyer said. You have answered my question. In other words, before you filed the two dismissals of which we have evidence here you did go to your lawyer's office? A. I went there and I signed them; yes, sir."

The foregoing testimony when considered with the other evidence in the case at most creates a conflict which could be and was resolved by the trial court into the foregoing finding. Viewing this evidence in support of the judgment all conflicts must be resolved in favor of the respondent and all legitimate and reasonable inferences indulged in to uphold the judgment if possible. ▮ When there is any substantial evidence which will support the conclusion reached by the trier of fact the judgment must stand. (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689]; *Estate of Jamison,* 41 Cal.2d 1, 13 [256 P.2d 984].) ▮ Since the record discloses substantial evidence in support of this finding of the court, it will be upheld.

The execution of a codicil referring to a previous will has the effect to republish the will as modified by the codicil.

(Prob. Code, § 25.) ■ The codicil of decedent expressly referred to his previous will dated November 5, 1948. The two documents thereby become one in legal effect and the new will so made speaks as of the date of republication. (*Estate of Challman,* 127 Cal.App.2d 736, 740 [274 P.2d 439] ; *Estate of Dubois,* 94 Cal.App.2d 838, 840-841 [211 P.2d 895].)

By his will and codicil, decedent declared that his heirs consisted of his wife Claire Murn Smith, his two children by his marriage to her, Janice Rosamond Smith and Bruce Russell Smith and his son by a previous marriage, Wilburn Smith, Jr. He expressed his desire to be fair to his children as well as to his wife and provided for the ·creation of two trust plans his wife being required to eventually elect to take under one of them. Each trust plan made provision for the support of all four heirs during the life of the wife and following her death to ultimately terminate, the remaining . estate to be distributed equally, share and share alike to his then living children and to the issue of any deceased child. With the exception of certain individual bequests in the codicil, the children were treated alike.

As the evidence shows the appraised value of the estate to be about $400,000 it is apparent that plaintiff's beneficiary interest therein is of substantial value. The burden was upon the plaintiff, not only to prove an oral agreement as claimed by him but to prove that any oral agreement which was made was not performed. (Code Civ. Proc., § 1981.) A review of the evidence in the case discloses that plaintiff failed to meet this burden as found by the trial court.

■ Plaintiff states that he is not required to elect to take under the provisions of the will and codicil or take under the oral agreement between himself and decedent of May 1950. This oral agreement is now established as one to provide in his will for plaintiff a *measure of inheritance, devise and bequest* at least equivalent in value to all sums which decedent had received of the plaintiff's property derived through plaintiff's trust. The court further found that no part of the claimed $41,279.34 or interest thereon has ever been paid to plaintiff except only as he has been reimbursed or compensated in full or in part for said sums by the provisions benefitting him in the will and codicil and the interest which plaintiff now has in decedent's estate through such documents.

There is no support in the record of this case for plaintiff's claim that under the terms of his agreement with decedent he

was entitled to both reimbursement of his .trust funds and equal provision under the will with the other children in respect to the residue of the estate. By his failure to prove by a preponderance of the evidence that the beneficiary interest which he owns in decedent's estate under the will and codicil is of a value less than all sums which decedent had received of plaintiff's property derived through the Michigan trust, plus interest, it must now be assumed that the agreement was performed by decedent and that plaintiff is fully reimbursed.

■■■ Lastly, plaintiff urges error in the rejection into evidence of three exhibits marked 11, 12 and 15 for identification. These are respectively the superior court file involving a will contest wherein decedent appeared as plaintiff and the estate of Laura Adelaide Kittle Smith, defendant; the file of a quiet title suit between decedent as plaintiff and said estate, and a divorce suit file entitled Clare A. Smith against decedent. Concededly, these proffered exhibits were offered for the limited purpose of showing an asserted lack of moral responsibility in decedent, his prior conduct and his interest in dealing with his several wives, his children and stepchildren and the estate of plaintiff's mother. The divorce action, Exhibit 15, involved a former wife and was filed some 42 years ago. The quiet title action and the will contest were instituted some 30 years before this trial. None of them had any bearing whatsoever on the issues presented by the instant case, and we cannot agree that the trial judge improperly exercised his judicial discretion in refusing their admission into evidence.

The judgment is affirmed.

Fox, Acting P. J., concurred.

Mr. Justice Ashburn, deeming himself disqualified, did not participate herein.

A petition for a rehearing was denied February 17, 1958, and appellant's petition for a hearing by the Supreme Court was denied March 19, 1958. Carter, J., and Traynor, J., were of the opinion that the petition should be granted.