58 Cal.App.3d 197 (1976)
129 Cal. Rptr. 787
Estate of HENRY E. HUNTINGTON, Deceased.
SECURITY PACIFIC NATIONAL BANK, as Trustee, etc., Petitioner and Respondent,
v.
EDWARDS H. METCALF et al., Claimants and Appellants;
JOHN BROCKWAY HUNTINGTON et al., Claimants and Respondents.
Docket No. 46945.
Court of Appeals of California, Second District, Division Four.
May 13, 1976.
*200 COUNSEL
Ball, Hunt, Hart, Brown & Baerwitz, George A. Hart, Jr., Frank C. Charvat, John R. McDonough, Boyle, Atwill & Robinson, James B. Boyle, Kendig, Stockwell & Gleason, Eugene L. Stockwell, Jr., and John M. Burnett for Claimants and Appellants.
Sheppard, Mullin, Richter & Hampton, J. Stanley Mullin, Wesley L. Nutten III, Laurence K. Gould, Jr., MacDonald, Halsted & Laybourne, A. Stevens Halsted, Jr., and Judith R. Gandel for Claimants and Respondents.
No appearance for Petitioner and Respondent.
OPINION
JEFFERSON (Bernard), J.
These are petitions brought by Security Pacific Bank, a testamentary trustee, to have determined the identity of beneficiaries of two testamentary trusts  the Marian Huntington Fund and the Residuum Fund  both established by the will of Henry E. Huntington, and for instructions.
Claiming to be the beneficiaries are John Brockway Huntington and Elizabeth Anne Huntington Davis, the adopted children of Marian Huntington. Opposing their claim are nephews and nieces of Marian Huntington; they are Edwards H. Metcalf, Henry E. Huntington II, Howard Huntington, Jr., David Huntington, Jane Huntington Kuska and Mary Huntington Burns.[1]
The trial court ruled that John Brockway Huntington and Elizabeth Anne Huntington Davis, the adopted children, were descendants of Marian Huntington as described in the will of Henry E. Huntington, and ordered the trustee to pay them equally the full amount of the Marian Huntington Fund and 6/10ths of the Residuum Fund. The contesting nephews and nieces of Marian Huntington have filed four separate appeals, which have been consolidated for our review here.
*201 The case turns upon the proper interpretation of Henry E. Huntington's will, executed by him more than 50 years ago, to wit, on August 1, 1925. There were two codicils to the will, neither of which has any bearing on the matter before us. Henry E. Huntington died in 1927, leaving a sizeable fortune amassed as the result of his successful participation in railroad development. At the time Huntington executed his will, he had three daughters, Clara (Perkins), Elizabeth (Metcalf), and Marian Huntington. His son, Howard, had died in 1922, leaving a wife, Leslie, and six children. Clara and Elizabeth were married at the time of the execution of the Huntington will, but Marian, then aged 42 years, had not married.
The dispositive plan revealed by the will was not complicated. The Huntington estate (of at least $24 million) was to be preserved for the benefit of Huntington's children and their descendants. The testator first created separate testamentary trusts of $1 million each for each of his three daughters for life, with the remainder to vest, on the life beneficiary's death "in the descendants per stirpes [of said life beneficiary] then surviving." He created similar trusts, in lesser amounts, for the children of his deceased son, Howard. There were various bequests to other relatives, unrelated persons, and the Huntington Library and Art Gallery.
The residuum clause of the will, dispositive of a substantial part of the estate, provided for equal sharing by the three Huntington daughters and, per stirpes, by the children of the deceased son, Howard Huntington. One-fourth of the net income was to be paid to each beneficiary for life; on the death of the life beneficiary, the beneficiary's share of the Residuum Fund was to be paid over to that beneficiary's "descendants, per stirpes, surviving."
Huntington's testamentary disposition relating to his daughter Marian differed from that relating to his two other daughters, in that she was given a power of appointment, by will, upon her death, of one-half of the property subject to the trust. In the fourth paragraph of the will, Marian was provided for in the following language: "I give and bequeath to my daughter, Marian Huntington, One Million Dollars ($1,000,000.00), said sum to be paid over to and held by the Pacific-Southwest Trust & Savings Bank IN TRUST for my said daughter during her life, to be invested and reinvested, loaned and reloaned by said trustee for the purpose of making the best available profit thereon, and all income derived from the same to be paid over to my said daughter by said *202 trustee semi-annually, and at the death of my said daughter all property in the hands of said trustee under this clause of my Will shall vest absolutely in the descendants per stirpes of my said daughter, Marian Huntington, then surviving, and if my said daughter, Marian Huntington, shall die without descendants her surviving, then and in that event, all property in the hands of said trustee under this clause of my Will shall vest absolutely, share and share alike, in the nephews and nieces of the said Marian Huntington, namely, the children of my deceased son, Howard Huntington, my daughter, Clara H. Perkins, and my daughter, Elizabeth V. Metcalf; PROVIDED, HOWEVER, that the said Marian Huntington is hereby empowered, if she so elect, to dispose of one-half of said property so held in trust for her, by her Last Will and Testament, and failing such testamentary disposition and dying without descendants her surviving, all of said property so held in trust under this clause of my Will shall vest absolutely, share and share alike, in her nephews and nieces, as hereinbefore stated."
In the 25th paragraph of the will, Marian was given one-fourth of the net income of the residuum trust for her life. The provision, in pertinent part, with respect to the remainder interest, states: "and upon the death of said Marian Huntington leaving descendants surviving, one-fourth of said property so held in trust shall vest in such descendants, per stirpes, and failing descendants, one-eighth of said property so held in trust shall be subject to her testamentary disposition and the other one-eighth thereof shall vest absolutely in her nephews and nieces; ..."
Marian was also, as were the other Huntington children, the beneficiary of certain inter vivos trusts established by Henry E. Huntington in 1920 and 1924, respectively. Those trusts gave to Marian, as did the will of her father, a power of appointment. The trust declarations, in pertinent part, provided for disposition of the remainder interest by stating that, "[i]f the said Marian Huntington shall not have had children born to her, or if she shall have died without any descendants surviving, ..." the trusts would terminate and either go to whomever Marian appointed by will, or to her "heirs at law."
In 1938, Marian, then 55 years old, with the approval of the California State Department of Social Welfare, adopted two small English children she had brought to California. Elizabeth Anne, one of these children, had been born October 2, 1936; the other, John, was born February 28, 1937. These two children took the name Huntington, and were raised by Marian as if they were her children by birth.
*203 Marian died at the age of 90, in 1973. Marian's will declared that John and Elizabeth, her adopted children, were her descendants. But she also purported to exercise her power of appointment in the event that her adopted children were not regarded as "descendants" within the meaning of her father's will.
(1a) In the instant proceeding, John and Elizabeth, Marian's adopted children, claim to be "descendants" within the meaning of Henry E. Huntington's will and, it is upon the interpretation to be given the word, "descendants," as used by Huntington, that this matter depends.
Prior to making a determination of the meaning of this language found in Huntington's will, the trial court admitted a considerable amount of extrinsic evidence as an aid in resolving the interpretation question of whether the testator had intended to include subsequently adopted children as "descendants" of his beneficiaries. Much of the extrinsic evidence concerned the Huntington genealogy. That offered by the adopted claimants was directed toward the premise that the testator was familiar with and accepted the concept of adoption in 1925, when he executed his will, and that he intended that the word, "descendants," would include adopted children. The contesting nephews and nieces introduced in evidence the trust declarations of 1920 and 1924 to show that Huntington had used the word, "descendants," as a synonym for relatives of the blood, natural rather than adopted children.
The trial court made certain amended findings of fact and conclusions of law; we summarize the relevant portions briefly. It was found that Henry E. Huntington, born February 27, 1850, had enjoyed a close lifetime relationship with his uncle, Collis Huntington, with whom he was associated in the railroad business; that Collis had adopted two children, Clara and Archer, at different times in his life. One finding stated that "[a]doptions were prominent within the Huntington family during the lifetime of Henry E. Huntington, and Henry E. Huntington was knowledgeable about, and familiar with, the facts and nature of such adoptions. Henry E. Huntington accepted adopted children into the Huntington family, and he considered and treated them the same as natural children."
Another finding was that Elizabeth Huntington Schmidt (one of the six children of Howard Huntington), a testamentary beneficiary named in the will of Henry E. Huntington, died in 1961; that her trust was created by language similar to that used in creating the other testamentary *204 trusts; that upon her death, the remainder interest was to be paid over to her "descendants, per stirpes, then surviving." A controversy arose because Elizabeth had adopted Cynthia Schmidt Van Riper, and the trustee had petitioned the probate court for instructions as to whether Cynthia was a "descendant" within the meaning of Henry E. Huntington's will. A compromise was reached between Cynthia and other members of the Huntington family and Cynthia took Elizabeth's share. However, the stipulation filed with the probate court specifically stated that the agreement made did not include agreement as to whether Cynthia was a "descendant."
The trial court found that, at the time this present dispute arose, all of Henry E. Huntington's children were dead; that Marian was the last survivor, having died in 1973. All of the Huntington grandchildren, with the exception of Marian's adopted children, Elizabeth and John, had taken their remainder shares from the testamentary trusts established by the will.
The trial court determined that Henry E. Huntington had "understood and intended the term `descendants' to include adopted children," and that consequently, John and Elizabeth were the descendants of Marian within the meaning and intent of the Henry E. Huntington will, particularly the Fourth and Twenty-Fifth Articles thereof.
Thus, the trial court concluded that John and Elizabeth were entitled to share the whole of the Marian Huntington Fund, and to share 6/10ths of the Residuum Fund, in preference to the claims to these funds made by the contesting nephews and nieces of Marian Huntington.
As indicated, the trial court admitted extrinsic evidence concerning the intent of the testator, Henry E. Huntington, including genealogical matter and a letter written by Henry to Archer in which he referred to Collis as Archer's father. Upon analysis, the extrinsic evidence that was offered and admitted was uncontroverted by both sides of this dispute, although the inferences to be drawn from this evidence were in conflict.
(2) The appropriate standard of appellate review applicable under such circumstances was set forth in Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865 [44 Cal. Rptr. 767, 402 P.2d 839]. Parsons holds that it is an appellate judicial function to interpret a written instrument, unless the interpretation turns upon the credibility of extrinsic evidence. "The possibility that conflicting inferences can be drawn from uncontroverted *205 evidence does not relieve the appellate court of its duty independently to interpret the instrument; it is only when the issue turns upon the credibility of extrinsic evidence, or requires resolution of a conflict in that evidence, that the trial court determination is binding. [Citation; fn. omitted.]. These same principles define the appellate function in the construction of wills. [Citation.]" (Estate of Dodge (1971) 6 Cal.3d 311, 318, [98 Cal. Rptr. 801, 491 P.2d 385].)
Thus, where the extrinsic evidence is uncontroverted, but conflicting inferences may be drawn, as in the instant case, the appellate court must exercise an independent judgment with respect to the interpretation of a written instrument, and if it determines that the interpretation of the instrument, as made by the trial court, is erroneous, it may reverse the judgment. (Estate of Dodge, supra, 6 Cal.3d 311, at p. 318, fn. 4.)
We perceive in the instant case the applicability of two basic legal concepts recognized in California law; while they are distinct from one another, they are not necessarily in conflict.
(3) The first concept relates to the interpretation of wills. "First, as we have said many times: `The paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible.' [Citation; fn. omitted.] The rule is imbedded in the Probate Code. (§ 101.) [Fn. omitted.] Its objective is to ascertain what the testator meant by the language he used. [Fn. omitted.]" (Estate of Russell (1968) 69 Cal.2d 200, 205-206 [70 Cal. Rptr. 561, 444 P.2d 353].)
(4) Russell also held that "the court must examine the instrument in the light of the circumstances surroundings [sic] its execution so as to ascertain what the parties meant by the words used." (Russell, supra, 69 Cal.2d 200, at pp. 208-209.) (Italics added.)
(1b) Applying these principles to the case at bench, we take them to compel us to examine the instrument in question in the context of the year 1925, when the instrument was executed, rather than at some later time. (See also Estate of Pierce (1948) 32 Cal.2d 265 [196 P.2d 1]; Abramovic v. Brunken (1971) 16 Cal. App.3d 719 [94 Cal. Rptr. 303].) In some cases the evidence of the testamentary intent at the time of the will's execution is sufficiently clear to establish without much doubt the testator's intention to include or exclude certain persons from sharing in *206 his estate; the expression of intent may be found in the instrument itself (as in Estate of McCormack (1969) 2 Cal. App.3d 492 [82 Cal. Rptr. 651]) or by extrinsic evidence relating to the circumstances and context of execution (Estate of Pierce, supra; Estate of Stanford (1957) 49 Cal.2d 120 [315 P.2d 681]). As was stated in Estate of Pierce, supra, testamentary intent must of necessity be determined on a case-by-case basis.
The other concept that must be borne in mind is that California law has long favored equal treatment for adopted children, equal to that bestowed upon natural children. This policy has been reflected in a number of different contexts: application of inheritance tax law; antilapse statutes; successional rights; and in will contests. As early as 1888, in In re Newman (1888) 75 Cal. 213 [16 P. 887], the California Supreme Court held that adoptive rights included the right to succeed to the estate of the deceased adopting parent. Also, in the early case of Estate of Winchester (1903) 140 Cal. 468 [74 P. 10], the Civil Code sections relating to adopted children were construed to give to adopted children the status of "lineal descendants" of their adopted parents.
In addition to the early decisional law, the Civil Code, adopted in California in 1872, included sections 226 and 227 which set forth a public policy that an adopted child shall be treated in all respects as the adopting parent's own lawful child would be treated; and as a part of this policy, section 228 of the same code provided that the adopted child would take the name of the person adopting, and that, thereafter, the child and parent would sustain toward each other "the legal relation of parent and child, and have all the rights and be subject to all the duties of that relation."
As a part of the statutory law, we find that, from 1872 to 1931, Civil Code section 1334 provided: "A testamentary disposition to ... `descendants' ... of any person, without other words of qualification, and when the terms are used as words of donation, and not of limitation, vests the property in those who would be entitled to succeed to the property of such person, according to the provisions of the title on succession, in this code."
Despite the expression of strong public policy favoring adoption set forth by earlier legislatures and the courts, it was not until 1955 that Probate Code section 257, enacted in 1931, was amended to complete the legal severance of adopted children from any rights with respect to either their natural parent or their natural parent's relatives; the section now *207 states that "[a]n adopted child shall be deemed a descendant of one who has adopted him, ..." (Italics added.) (See Estate of Haneberg (1971) 19 Cal. App.3d 643 [96 Cal. Rptr. 807].)
In keeping with the traditional favor with which California has viewed adopted children, such words in a will as "child" or "children" (Estate of Stanford, supra) and "lawful issue" (Estate of Heard (1957) 49 Cal.2d 514 [319 P.2d 637]) have been construed by reviewing courts to include adopted children, even when the adoption took place long after the will's execution. In Estate of Stanford, supra, testamentary intent in this regard was illuminated by a letter written by the testatrix before her death, expressing approval of the concept that adopted children be accorded the same legal status as natural children, and this evidence apparently contributed heavily to the interpretation of the will (executed in 1903) made by the Stanford court favoring the three adoptees involved (including one adult).
Estate of Heard, supra, construing a 1935 will, discussed the impact of the testator's intent, and held that a testator is presumed to have known, or been advised, of the legal public policy to treat adopted children the same as blood children and thereby to favor the inclusion of adopted children in such generally described groups as "children" or "issue." It was stated by the Heard court that unless a testator employs language clearly communicating a contrary intent, it may be assumed that he knew of and approved of the rules of law and public policy regarding the status of adopted children.
In Estate of McCallen (1975) 53 Cal. App.3d 142, 152 [125 Cal. Rptr. 645], a class gift in a will was construed to include a subsequently adopted child. Relying upon Heard and Stanford, the court remarked: "Nothing in the will indicates that the testator intended to exclude adopted children. In such circumstances, it must be presumed that the testator intended his will to be construed in conformity with the law and public policy of this state that an adopted child enjoys the same status as a natural child."[2]
What was known and understood by Henry E. Huntington in 1925 is, of course, of crucial importance in establishing his testamentary intent. The policy of affording equal treatment to adopted children in the *208 sharing of the estate of their adoptive parents had long been expressed in this state. It is reasonable to conclude that the language employed in the inter vivos trusts, created by Huntington in 1920 and 1924, providing for the remainder interest of Marian in the alternative, i.e., "if [she] shall not have had children born to her, or if she shall have died without any descendants surviving, ..." suggests that the word "descendants" was intended by him to have a broader, more inclusive meaning than "children born to her."
The contesting Huntington nephews and nieces argue for a narrow construction of the word "descendants," which would limit its meaning to those persons related to Marian by blood. These contestants urge that since Marian was unmarried and childless at the time of the will's execution, and no longer a young woman, her father could hardly have foreseen that she would later in her life take up the duties of an adoptive parent. There is no evidence, however, to support the view that Huntington was particularly concerned with limiting the objects of his bounty to blood relatives; certainly his life experience had been such that, had he wished to assure such limitation, he could have, and would have done so.
We agree with the trial court that Henry E. Huntington, at the time he executed his will, understood and accepted the concept of adoption; that he understood that the state of the law then current was to equalize adoptive and natural children and to treat them as lineal descendants of their adopting parents. It must be noted, however, that what is at issue here is not which persons the testator would have regarded as his descendants, but which persons he would have regarded as the descendants of his daughter, Marian. It is certainly reasonable to assume that, under the circumstances presented, the term, "descendants," as employed by Huntington, included Marian's adopted children.
(5) Appellants herein finally contend that the trial court erred when it refused to admit into evidence a statement made by Marian Huntington in 1970 in a conversation which she had with appellant Howard Huntington, Jr. The alleged statement of Marian was to the effect that it was her understanding that she had testamentary disposition as to one-half of her share of the residuum to the trust. The trial court ruled that the statement was inadmissible hearsay. The contention is made that Marian's statement should have been admitted as a declaration against interest under the exception to the hearsay rule set forth in Evidence Code section 1230.
*209 Although not clearly articulated, it would appear that appellants' theory of relevancy for Marian's hearsay statement is that it is in effect an implied statement that the term, "descendants," as used in her father's will, excluded her two adopted children as not being her descendants. Appellants assert that this hearsay statement of Marian comes within the declaration-against-interest exception to the hearsay rule since Marian's death made her unavailable as a witness and, at the time the statement was made, it was contrary to her pecuniary or proprietary interest. This contention is without merit for several reasons.
One essential provision of the declaration-against-interest exception to the hearsay rule, created by Evidence Code section 1230, is that the declarant must have "sufficient knowledge of the subject" of the statement. This requirement is not met in the case at bench. If Marian's statement is considered as having reference to the provisions of the residuum trust fund set forth in paragraph 25 of the Huntington will in question, the statement demonstrates on its face that she lacked knowledge of its provisions. Under the provisions of the residuum trust, the only reference to Marian's power of testamentary disposition relates to a one-eighth interest in the event of her death without having descendants surviving. Her reference, therefore, to her having a right of testamentary disposition in one-half of her interest in the residuum trust cannot be founded upon any "sufficient knowledge of the subject" within the meaning of the declaration-against-interest hearsay exception set forth in Evidence Code section 1230.
The other trust in which Marian had an interest was set forth in paragraph four of the Huntington will. Under the provisions of paragraph four, Marian was given a testamentary power of appointment to dispose of one-half of the property held in trust for her under that particular trust. Paragraph four, however, is different from paragraph twenty-five in that, under paragraph four, Marian's election to exercise a testamentary disposition of one-half of the property held in trust for her is not limited by any condition such as the absence of surviving descendants, found in paragraph twenty-five. If we were to assume that Marian's hearsay statement related to the provisions of paragraph four, the statement could not be considered as a declaration against interest, since it did not purport to state that she had an interest in the trust fund less than the interest revealed by the actual provisions of paragraph four.
If we consider Marian's express words as an implied statement by her as to the construction to be given the term, "descendants," in either *210 paragraph four or twenty-five of the Huntington will, it is a statement of opinion on her part and is inadmissible for this reason. She was not qualified to express an opinion concerning the meaning and interpretation of language used by her father in his will. The statement does not purport to be based upon any conversation which Marian had with her father in which he expressed to her what he intended by using the term, "descendants," in the two paragraphs involved in the instant case. Marian's hearsay statement of opinion, even if it otherwise be considered a declaration against interest, can fare no better than if Marian had sought to express such an opinion as a witness in court. The expression of such an opinion by a lay witness would be inadmissible by virtue of the provisions of Evidence Code section 800. This section limits opinion testimony by a lay witness to that which is "[r]ationally based on the perception of the witness" (Evid. Code, § 800, subd. (a)) and which is "[h]elpful to a clear understanding of his testimony" (Evid. Code, § 800, subd. (b)).
There is no logical support for the view that an implied statement by Marian that her two adopted children are not descendants under her father's will constitutes a statement against Marian's proprietary interest. At best, such statement can only be considered as being contrary to the proprietary interest of her children. To qualify under the declaration-against-interest exception to the hearsay rule, a statement must be contrary to the declarant's own interest. Nor does the fact that a hearsay statement of the declarant, or a portion thereof, is contrary to the declarant's interest make admissible, under this exception to the hearsay rule, other portions or parts of declarant's statement that are self-serving or simply contrary to another person's interest  pecuniary, proprietary or penal. (See People v. Leach (1975) 15 Cal.3d 419 [124 Cal. Rptr. 752, 541 P.2d 296].)
Marian's hearsay statement also fails to satisfy the requirement of Evidence Code section 1230, designed to establish trustworthiness, that, in order for a declarant's statement to be considered a declaration against interest, the trial court must be satisfied that a reasonable person in declarant's position would have realized that the statement was so far contrary to declarant's interest that it would not have been made unless the declarant believed the statement to be true. Applying the reasonable-person test to Marian's statement impels the conclusion that, when she made the statement, she would not have considered it as a statement against either her pecuniary or proprietary interest.
*211 Appellants intimate also that Marian's hearsay statement was of a type that ought to be admissible against her adopted children as her successors in interest. If a hearsay statement qualifies as a declaration against interest under Evidence Code section 1230, it becomes admissible against any party to the litigation to the extent that it is relevant to an issue presented. Perhaps appellants have in mind another section of the Evidence Code, to wit, Evidence Code section 1225. Section 1225 makes admissible against a party a statement of a party's predecessor in interest which tended to impugn the interest of the predecessor at the time the predecessor held title and made the statement. The basis for reliability of this hearsay exception is that statements of a declarant, made while he has title to property and which are in disparagement of that title, are statements against the interest of the declarant.
But Evidence Code section 1225 is not applicable in the case at bench, since Marian's adopted children, John and Elizabeth, as parties to the litigation, are not asserting an interest or right to the trust property which is dependent upon the prior right to this property of Marian, the declarant. The adopted children are not successors in interest to the interest which Marian had in the trust property. The interest of Marian's children is derived from the will of Huntington, just as Marian's own interest was derived from the will of Huntington. The children take their interest through Huntington and not through their mother, Marian, whose interest was solely that of a life beneficiary.
The judgment appealed from is affirmed.
Files, P.J., and Jefferson, J.,[*] concurred.
A petition for a rehearing was denied June 8, 1976, and appellants' petitions for a hearing by the Supreme Court were denied July 8, 1976. Wright, C.J., did not participate therein.
NOTES
[1] Not all of the nephews and nieces of Marian Huntington chose to contest the adopted children's claim; John and Lawrence Metcalf filed a declaration in the probate court declining to join the contest because they stated that John Brockway Huntington and Elizabeth Anne Huntington Davis had always been considered the children and descendants of Marian Huntington.
[2] Subsequently adopted adults, however, have not fared so well in California; see Abramovic v. Brunken (1971) 16 Cal. App.3d 719 [94 Cal. Rptr. 303]; Williams v. Ward (1971) 15 Cal. App.3d 381 [93 Cal. Rptr. 107].
[*] Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.