[No. B089496. Second Dist., Div. Four. Oct. 4, 1995.]

ESTATE OF ALICE JOSLYN, Deceased.
MARCELLUS L. JOSLYN et al., Contestants and Appellants, v.
HELEN MELAYNE DAVIS, Claimant and Respondent.

## COUNSEL

Mayer, Brown & Platt, Lee N. Abrams and Jacqueline R. Brady for Contestants and Appellants.

Rutan & Tucker, Theodore I. Wallace, Jr., and Matthew K. Ross for Claimant and Respondent.

## OPINION

**WOODS (A. M.), P. J.**—Appellants Marcellus L. Joslyn, Roland M. Joslyn, Marcia Joslyn Sill, Leslie Poleri, Lysbeth Drenick Lam and David Drenick are beneficiaries of the will of their grandmother, Alice Joslyn. They appeal from judgment determining that respondent Helen Melayne Davis is also a beneficiary under the will by virtue of the fact that she is the adopted daughter of Alice N. Joslyn's son, Marcellus N. Joslyn. The issue presented is whether the trial court correctly determined that Alice Joslyn intended the class "descendants of [Marcellus N. Joslyn]" to include respondent even though she did not become Marcellus N. Joslyn's stepdaughter until 8 months after Mrs. Joslyn died and was not adopted by him until 15 years later when she was 24 years old. The trial court concluded that Mrs. Joslyn did not intend to exclude adoptees such as respondent from the class of "descendants" entitled to take pursuant to her will. Therefore, it ordered that respondent was entitled to enjoy the benefits of the Marcellus N. Joslyn Fund established under the will of Alice N. Joslyn. For reasons explained in this opinion, we affirm.

### FACTS

The will which we are called upon to interpret was executed in 1937 in Hinsdale, Illinois. It provided, in relevant portion, that a trust fund was to be established for the benefit of each of Mrs. Joslyn's children, and that upon the death of each child, the income was to be distributed to the child's living descendants, equally per stirpes. In the event that any income beneficiary died without leaving descendants, the principal of that beneficiary's fund was to be paid to persons appointed by the beneficiary in his or her last will and testament, or, in default of such an appointment the principal was to be added to the principal of other funds created under the will. The will further provided that 21 years after the death of the last survivor of Mrs. Joslyn's husband and her children and grandchildren living at the date of her death, the trustee was to distribute the principal of the fund to the beneficiaries, per stirpes. In 1945, Mrs. Joslyn executed a codicil which limited the exercise of

the power of appointment by providing that it could only be exercised in favor of her "lawful living descendants (other than said beneficiary), spouses of such descendants, or the spouse of such beneficiary in such proportions and on such terms and conditions as such beneficiary shall appoint in his Last Will and Testament . . . ."

Although Mrs. Joslyn and her husband were residents of Illinois, they wintered in Bel Air, California, due to Mrs. Joslyn's poor health and her inability to tolerate Illinois winters. The codicil was executed in California in August of 1945,[1] suggesting that the Joslyns' stays in California were not limited to the winter months. Mrs. Joslyn spent the last full year of her life in California, and died in California in March of 1949. In December of 1949, the Los Angeles Superior Court entered an order settling and distributing her estate, valued at more than $1,262,000, into four separate trust funds of equal value for the benefit of her four children, Marcellus N., George, Merrit, and Mary as directed in her will.[2]

When the will was executed, Mrs. Joslyn's son Marcellus N. Joslyn, a lawyer, had been married twice and had five natural children. In November of 1949, eight months after his mother's death and one month before the order distributing her estate, he married for the third time, thus becoming the stepfather of respondent. Respondent, then nine years old, lived with her mother and stepfather until she was eighteen, using Joslyn as her surname, and enjoying a father-daughter relationship with her stepfather. She was not adopted by her stepfather, however, until 1964, when she was 24 years old, married, and living in Germany with her husband.

Marcellus N. Joslyn died on August 27, 1992. On May 5, 1993, the trustee of the Marcellus N. Joslyn Fund commenced this action with a petition for instructions as to whether respondent should be included within the class of beneficiaries entitled to take under Mrs. Joslyn's will as a descendant of Marcellus N. Joslyn.

The evidence received in the trial court[3] focused primarily upon the relationship (or lack thereof) between Marcellus N. Joslyn, his father and his

---

[1]The codicil recited that Mrs. Joslyn resided in Hinsdale, Illinois, but it was witnessed by persons who lived in Los Angeles.

[2]A final decree of distribution supersedes the will. (*Estate of Heil* (1989) 210 Cal.App.3d 1503, 1508 [259 Cal.Rptr. 28].) Courts nonetheless look to the will in construing the decree where, as here, the decree repeats the terminology of the will. (*Ibid.; Estate of Clancy* (1958) 159 Cal.App.2d 216, 222 [323 P.2d 763].) For ease of reference, this opinion will simply refer to the will rather than to the decree of distribution.

[3]The parties stipulated to certain facts in the trial court, but their written stipulation was not included in the parties' joint appendix on appeal. The joint appendix also did not contain a

children. It demonstrated, in brief, a family history of conflict and estrangement. Two of Marcellus N. Joslyn's children became wards of the state in 1954, and ultimately grew up under the legal guardianship of a paternal uncle who lived in Michigan. Another child became estranged from his father as a young adult in 1951. In 1963, Marcellus L. Joslyn, the father of Marcellus N. Joslyn, died leaving the bulk of his estate in trust for the benefit of his grandchildren. Marcellus N. Joslyn contested his father's will, further alienating himself from his natural children in the process. After the will contest was dismissed, the trustee of the estate, acting both as an individual and on behalf of the beneficiaries, sued Marcellus N. Joslyn for malicious prosecution. Mr. Joslyn failed to appear for his deposition, his answer was stricken, and judgments totaling nearly $1 million were entered against him. These judgments were satisfied by the taking of a ranch in Texas on which Mr. Joslyn lived, and from income due to him from family trust funds.

In 1964, the year after his father died, Marcellus N. Joslyn filed a petition for adoption of respondent in a federal court in Texas. The petition alleged that he wished to adopt respondent "so that following said adoption [he] and the natural mother of said child . . . jointly share in the parentage of [respondent] as though born to them of their marriage . . . ." The adoption decree entered on July 22, 1964, pursuant to this application stated, ". . . Helen Melayne Fennel Harn shall henceforth be entitled to all rights and privileges of a natural born child of Petitioner and the said Petitioner shall henceforth be entitled to all rights of a parent as though said child had been naturally born to him; provided, however, that the rights of inheritance of the said Helen Melayne Fennel Harn shall be as are given to her by the laws of the State of Texas."

Appellants argued that the motivation for the adoption was not for reasons of love and affection but for the purpose of obtaining respondent's agreement to share with her mother whatever benefits she might receive under Alice Joslyn's will as the legal descendant of Marcellus N. Joslyn.

The evidence was undisputed that Marcellus N. Joslyn and respondent had a loving, if occasionally "bumpy," relationship which continued for the

complete copy of the trustee's petition for instructions. In response to the request of the clerk of this court for a complete copy of the petition, appellants' counsel also provided us with a copy of the stipulation. On our own motion, we augment the record to include both.

Some of the documents included in the appendix filed in this court and referred to by the parties in their briefs were not received in evidence by the trial court. Appellants make a passing argument that one of those documents, marked for identification as exhibit 10 should have been received, but they cite no authority for this assertion. Therefore, the issue has been waived (*Amato* v. *Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794 [23 Cal.Rptr.2d 73]), and our review will be confined to the evidence actually received by the lower court.

duration of his life. In contrast, Marcellus N. Joslyn remained estranged from his natural children until the late 1980's, and even made an ineffective attempt to disinherit them at one point. Respondent had little contact with her adoptive father's family. Although Marcellus N. Joslyn's natural children received a Christmas stipend from Mr. Joslyn's father, respondent did not. Mr. Joslyn's father also executed a will in 1957 which excluded adopted children except for three children adopted by his son Merrit. There was no evidence, however, that the senior Mr. Joslyn knew of respondent's existence.

In 1989, Marcellus N. Joslyn required the services of a convalescent home. Respondent found a convalescent home for him, completed the application and visited him there daily. He told people at the home that she was his daughter. When Mr. Joslyn died in August of 1992, respondent complied with the request of Mr. Joslyn's sister Mary that half of his ashes be placed in the family crypt. The remainder of his ashes were divided between his daughter Marcia, respondent, and a cousin. Respondent and Marcia poured their ashes into the ocean in a simple, private ceremony at which Marcia read a poem and they expressed their feelings about Mr. Joslyn. Marcia told respondent, " 'He really loved you.' " At a family gathering to celebrate Mr. Joslyn's life, his second wife told respondent, " 'You were more of a daughter to him than my daughter.' "

## DISCUSSION

Our task is to determine Alice Joslyn's intent concerning a circumstance which occurred long after her death. ■ Although there are numerous principles of testamentary construction available to guide our analysis, they all yield to the paramount rule requiring that the testator's intention must, as far as possible, be given effect. "[T]estamentary intent must of necessity be determined on a case-by-case basis." (*Estate of Huntington* (1976) 58 Cal.App.3d 197, 206 [129 Cal.Rptr. 787].) Where the evidence of intent at the time of the execution of the will is sufficiently clear to establish the testator's intention, the expression of intent may be found in the instrument itself. *(Ibid.)* Where the evidence of intent is not clear, however, we may also take into consideration the circumstances at the time of execution of the will and public policy as expressed in statutory and case law. (*Estate of Haneberg* (1971) 19 Cal.App.3d 643, 648 [96 Cal.Rptr. 807].)

The only testimony concerning Mrs. Joslyn's intent was given by her daughter Mrs. Mary Currivan, who testified that she did not join in her brother's action contesting their father's will because she knew what her parents, and particularly her mother, desired. It was her understanding that

Mrs. Joslyn "was very family oriented and would have nothing to do with anyone who wasn't." Mrs. Currivan admitted that she had never spoken with her mother about the will, but explained that her mother's "attitude" was "very obvious." The trial court discredited this testimony as demonstrated by its comments and its judgment. Since we are bound by the trial court's assessment of credibility (*In re Marriage of Slivka* (1986) 183 Cal.App.3d 159, 162 [228 Cal.Rptr. 76]; *Evje* v. *City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 492 [261 P.2d 279]), we, also, must disregard this evidence.

The language of the will sheds little light on Mrs. Joslyn's intention. If, in 1937, Mrs. Joslyn had asked her attorney whether adopted grandchildren would be considered beneficiaries under the terms of her will, she would have been advised that at that time Illinois law applied a judicial presumption called "the stranger to the adoption rule" which provided that in the absence of language to the contrary, a testator was deemed to have intended to include only blood offspring and to exclude adoptees from a class gift to descendants. (*Harris Trust & Sav. Bank* v. *MacLean* (1989) 186 Ill.App.3d 882, 886 [134 Ill.Dec. 597, 542 N.E.2d 943, 945].) She would also have been advised that the term "descendant" had been interpreted by Illinois courts to encompass only blood offspring and that the term "per stirpes" was also considered to disqualify adopted persons. (*Continental Bank, N.A.* v. *Herguth* (1993) 248 Ill.App.3d 292, 296 [187 Ill.Dec. 395, 617 N.E.2d 852, 855].)[4] On the other hand, Mrs. Joslyn included a power of appointment in her will, thus indicating that she did not intend to keep her estate strictly within blood lines. (*Estate of Moulton* (1976) 63 Cal.App.3d 1, 8-9 [133 Cal.Rptr. 500].) Consequently, the language of the will and the circumstances at the time the will was executed reveal an ambiguity as to Mrs. Joslyn's intent.

■ When Mrs. Joslyn executed the codicil to her will, thereby republishing the will (*Smith* v. *Security-First Nat. Bank* (1958) 157 Cal.App.2d 57,

---

[4]This state of the law continued in Illinois until 1955 when the Illinois Legislature enacted new code provisions decreeing that the term "descendant" included a " 'child lawfully adopted' " (*Continental Bank, N.A.* v. *Herguth, supra,* 248 Ill.App.3d at p. 297 [617 N.E.2d at p. 856]), and that an adopted child would be treated as a natural child in all instruments executed after September 1, 1955 unless a contrary intent was plainly expressed in the instrument. (*Harris Trust & Sav. Bank* v. *MacLean, supra,* 186 Ill.App.3d at p. 886 [542 N.E.2d at p. 945].) As a result of further statutory amendments, Illinois law now provides that "After September 30, 1989, a child adopted at any time before or after that date is deemed a child born to the adopting parent for the purpose of determining the property rights of any person under any instrument executed before September 1, 1955, unless . . . [t]he intent to exclude such child is demonstrated by the terms of the instrument by clear and convincing evidence." (Illinois Probate Act of 1975, art. II, § 5/2-4, subd. (F)(1).)

64 [320 P.2d 34]) in California,[5] the law and public policy of this state had long favored equal treatment for adopted children. Legislation had been enacted providing that an adopted child was a lawful descendant for purposes of succeeding to the estate of the adoptor, the same as a natural child. (*Estate of Smith* (1946) 73 Cal.App.2d 291, 292 [166 P.2d 74]; *Estate of Huntington, supra*, 58 Cal.App.3d at p. 206; *Estate of Haneberg, supra*, 19 Cal.App.3d at p. 647, fn. 2.) Therefore, we may presume that Mrs. Joslyn, saying nothing to the contrary in her codicil, did not intend to exclude adopted children when, by codicil, she limited her children's exercise of their power of appointment to "lawful living descendants . . . , spouses of such descendants, or the spouse of such beneficiary . . . ." This conclusion finds further support in the fact that it was entirely possible, under the codicil, that a spouse of a descendant could have taken under the will as an appointee of a descendant. This demonstrates an intent not to reserve the estate solely for blood relatives. (*Estate of Moulton, supra*, 63 Cal.App.3d at pp. 8-9.)

At the time the codicil was executed, however, and continuing through the time of Mrs. Joslyn's death, California did not allow the adoption of adults, and her son had not yet become the stepfather of respondent. If we were required to ascertain the testatrix's probable intent with reference to family circumstances and prevailing social mores which existed during her lifetime, these factors would weigh against including respondent in the class of descendants entitled to take under Mrs. Joslyn's will. Respondent argues facts which occurred after Mrs. Joslyn's death, contending by implication that we may take into consideration circumstances which arose after Mrs. Joslyn's death. Appellants, on the other hand, contend that courts generally "assum[e] that the testator's attitude toward adoption would have reflected prevailing attitudes in the community at the time the will was executed." While there is no question but that circumstances surrounding the execution of the will, including prevailing social attitudes, are relevant (*Wells Fargo Bank* v. *Huse* (1976) 57 Cal.App.3d 927, 933 [129 Cal.Rptr. 522]), the case cited by appellants on this issue, *Estate of Stanford* (1957) 49 Cal.2d 120 [315 P.2d 681], undermines their contention that such attitudes are determinative. The *Stanford* case involved a will executed in 1903 by a testator who died in 1905 and a distribution, in the mid-1950's, of the corpus of a testamentary trust to three persons adopted in New York in 1924, one of whom was an adult at the time of the adoption. The California Supreme Court rejected the contention that the adoptees could not take as "children" of the testator's child. Prevailing attitudes at the time the Stanford will was

---

[5]Appellants conceded in the trial court that California law governs in this case. They also concede that if Mr. Joslyn had adopted respondent when she was 17, they would not be involved in this lawsuit.

executed were certainly no more liberal with regard to adoptees than they were some 20 years later when the will in this case was executed. The majority opinion, nonetheless, did not even mention the fact that adoption of adults was not allowed in California at the time the will was executed or at the time of the adoption.[6]

Although we reject appellants' contention that our consideration of public policy must be confined to that which existed at the time the will in this case was executed, there remains the question of how far into the future we may extend this inquiry. The answer to this question must take into account the fact that we are concerned with a gift to a class. Case law holds that in such cases, "normally the members of such class who are to take the property are ascertained by applying the statute of succession as of the time of the death of the designated ancestor. [Citations.]" (*Estate of Miner* (1963) 214 Cal.App.2d 533, 540 [29 Cal.Rptr. 601]; *Estate of Doyle* (1962) 202 Cal.App.2d 434, 441-442 [21 Cal.Rptr. 123]; *Estate of McCallen* (1975) 53 Cal.App.3d 142, 151 [125 Cal.Rptr. 645].) Since the class in this case was designated by Mrs. Joslyn as the "living descendants" of her son, i.e., those descendants who were living at the time of his death, we conclude we may take into consideration the law with regard to adopted adults which existed at the time of Mr. Joslyn's death. (*Estate of McCallen, supra,* at p. 152; *Estate of Huntington, supra,* 58 Cal.App.3d at p. 207.) By that time, the adoption of adults had been legal in California since 1951 (*Williams* v. *Ward, supra,* 15 Cal.App.3d at p. 384), and their rights of intestate succession had been broadened in 1955 to allow adoptees to inherit both by and through their adopting parent. (*Estate of Haneberg, supra,* 19 Cal.App.3d at pp. 646, 648.) Some case law also existed which demonstrated that adult adoptees were not precluded from taking under pre-1951 wills. (See *Estate of Stanford, supra,* 49 Cal.2d 120; *Estate of Moulton, supra,* 63 Cal.App.3d 1 [a stepdaughter raised from the age of 10 by the testator's son, but not adopted until she was 40 was "lawful issue" of her adoptive grandmother even though the adoption was for the purpose of preventing another relative from taking under a will executed in 1923 by a testator who died in 1929]; *Estate*

[6]We are aware that Division Four of the First Appellate District has suggested that *Estate of Stanford* is not authority for the proposition that adopted adults are entitled to take as "children" of a child. (*Williams* v. *Ward.* (1971)15 Cal.App.3d 381, 387-388 [93 Cal.Rptr. 107].) That court reasoned that the issue of adult adoptions was irrelevant to the outcome of the case, and the parties simply chose not to raise the issue. While this may be true, we do not presume that the *Stanford* court did not fully appreciate what it was doing when it affirmed distribution of the corpus to three adoptees, including one who was adopted as an adult. The dissent pointed out, inter alia, that one of the adoptees was an adult woman and that California law did not permit the adoption of an adult prior to Mrs. Stanford's death. (49 Cal.2d at p. 163.) This indicates the issue was considered by the entire court. Even if there had been no dissent, however, the disposition affirming the distribution to the adult adoptee carried the necessary inference that she was legally entitled to take under the will.

*of Pittman* (1980) 104 Cal.App.3d 288 [163 Cal.Rptr. 527] [remand to determine whether adults adopted in 1953 could take as "children" under a 1914 will].)

There was a split of authority, however, as to the circumstances under which adult adoptees were entitled to benefit from class gifts. (See *Estate of McCormack* (1969) 2 Cal.App.3d 492 [82 Cal.Rptr. 651] [stepson who was 14 when his mother married son of testator and 37 at the time of adoption by son was not a member of the class of son's "issue" pursuant to a 1941 will where extrinsic evidence showed testator did not like stepson's mother and bequeathed her separate property to her "only family"]; *Williams* v. *Ward*, *supra*, 15 Cal.App.3d at p. 383 [2 adults who were adopted in 1967 by a life tenant of real property bequeathed in 1930 could not take as "children" of the adoptor]; *Abramovic* v. *Brunken* (1971) 16 Cal.App.3d 719 [94 Cal.Rptr. 303] [adopted stepson was not a "child" within the meaning of a 1940 will where testator died 5 months after her son married the mother of his 19-year-old stepson, but did not adopt him until 12 years later when he was 32 years old]; *Estate of Pittman*, *supra*, 104 Cal.App.3d 288.)

The parties in this case focused the trial court's attention on three of these cases: *Williams* v. *Ward*, *supra*, *Abramovic* v. *Brunken*, *supra*, *and Estate of Pittman*, *supra*. In *Williams* v. *Ward*, *supra*, a testator died in 1930, leaving a single, 37-year-old daughter with questionable ability to bear children, and a will which devised to his daughter a life estate in real property with the remainder to her children. The testator's daughter adopted two minors seventeen years after her father's death. Twenty years later, at the age of 73, she adopted 2 more people, both of whom were adults. The issue was whether the adult adoptees could take under the will as "children" of the adoptor. The reviewing court acknowledged that when the will was executed statutes of succession defined "children" to include adoptees. The court noted, however, that adult adoptions were not allowed in California until 21 years after the testator's death, that the term "children" ordinarily referred to persons under the age of majority, and that the parent-child relationship was qualitatively different when the adoptee was an adult rather than a child. One of the primary concerns of the reviewing court was the question of motive in adult adoptions, i.e., the possibility that the effect of an adult adoption might be to give the primary beneficiary a power of appointment even though the testator had not done so. (15 Cal.App.3d at pp. 386, 388.) The court reasoned that if the testator had intended to include persons such as the adult adoptees in question, then the life tenant could continue to expand the class to include other persons to the detriment of the interests of the earlier adopted minors. This result, the court concluded, was not intended by the testator. (15 Cal.App.3d at p. 388.)

In *Abramovic* v. *Brunken, supra,* 16 Cal.App.3d 719, the testator executed a will in 1940 which involved a trust for the benefit of the children of his then unmarried son John. Ten months after execution of the will John married a woman who had a 19-year-old daughter. The testator died within five months of the marriage. Twelve years later, in 1953, John adopted his stepdaughter, then 32 years old. The reviewing court found it significant that John did not adopt his stepdaughter while she was a minor or while she was a member of his household. (16 Cal.App.3d at p. 722.) It noted that the language used in the will (including the phrase " 'In the event that my said son should marry . . . I give to the children, if any, of said John . . .' "), indicated an intent to include only biological children. (16 Cal.App.3d at p. 723.) The court also reasoned that the testator could not be charged with knowledge of the "expanded concept" of "children" established in the law long after the will was executed. For these reasons, the reviewing court concluded, citing *Williams* v. *Ward, supra,* that the stepdaughter was not a "child" within the meaning of the will. (16 Cal.App.3d at p. 725.)

In *Estate of Pittman, supra,* 104 Cal.App.3d 288, the issue concerned the right of adult adoptees to take under a testamentary class gift made in a 1914 will to the "child" or "children" of the testator's children. The evidence showed that when one of the testator's six children died, that child's only son received her share of trust income until his death in 1959. Six years before his death the son had adopted two adults, aged 31 and 33 years. There was no evidence of a past relationship between the adoptor and the adoptees, the motive for the adoption or any of the circumstances surrounding the adoption. The trustee petitioned the trial court for instructions as to whether great-grandchildren of the decedent were beneficiaries under the trust, and was instructed by the court that they were. The trustee then petitioned for instructions as to whether great-grandchildren by adoption should share as income beneficiaries and remaindermen under the trust. The other beneficiaries argued that the testator could not have intended to include adopted adults in the class of "children" because it was not legal to adopt adults in California when the will was executed. The reviewing court concluded that "generally the exclusion of adult adoptees from class designations of 'children' and 'children of . . . children' established in pre-1951 wills probably best comports with the inferred intention of the testator, but that an exception ought to be recognized as to adult adoptees who had actually been taken into the adoptive parent's home and family as minors and who were reared by the adoptive parent in 'loco parentis.' " (104 Cal.App.3d at pp. 294-295.) The court explained: "The exception would most closely accord with the pattern of personal relationships a testator would envision as coming within the class designations and thus be in keeping with the intent of the testator at the time the testamentary document was executed. Adult adoptees coming

within the exception should therefore be deemed to come within the class unless it is shown that the purpose of the adoption was to diminish or defeat the income and remainder interests of other beneficiaries ' "for purposes of financial gain or as a spite device." ' [Citations.]" (104 Cal.App.3d at p. 295.) Since there was no evidence on these issues, the matter was remanded to afford the adult adoptees to bring themselves within the exception if possible.

Appellants criticize *Pittman,* which the trial court found persuasive, on the grounds that it is "problematic" and not in harmony with California law and public policy. They argue that *Williams* v. *Ward, supra,* 15 Cal.App.3d 381, and *Abramovic* v. *Brunken, supra,* 16 Cal.App.3d 719, reflect the majority and better reasoned view. This view, they assert, continues to follow the "stranger to the adoption" rule when the adoptee was adopted as an adult. We disagree. We are not aware of any California case in which the "stranger to the adoption" rule has been applied. Certainly neither *Williams* nor *Abramovic* could be characterized as applying that rule. In both cases, the reviewing courts simply looked to factors relevant to a determination of testamentary intent and concluded that under the circumstances presented the adoptee was not a person whom the testator intended to include in a class gift to "children" of their children.

We do not find *Pittman* "problematic." The rule announced in that case, applicable to class gifts to "children" and "children of children" in pre-1951 wills, begins with a presumption that adult adoptees are excluded from the class and places the burden on them to prove that they fall within an exception to the general rule, i.e., that they were taken into the adoptive parent's home as minors and reared by the adoptive parent.

We agree with the rationale of the in loco parentis concept that children reared within the family, even though not adopted until they are adults, are compatible with the intent of the testator in creating this class gift. While we understand the concern of the *Pittman* court with adoptions entered into "for purposes of financial gain or as a spite device," we do not interpret this language as broadly as the appellants urge us to. We do not believe that a showing of financial gain or spite necessarily defeats the bequest. Those adult adoptees who are able to show that they were reared by the adoptive parent will seldom be able to counter the charge that the purpose of the adoption had something to do with financial gain. As the *Pittman* court itself acknowledged, a significant percentage of adult adoptions involve stepparent-stepchild relationships. (*Estate of Pittman, supra,* 104 Cal.App.3d at p. 294.) Certainly one valid reason for undertaking to establish the legally recognized parent-child relationship after the stepchild has reached adulthood is to ensure the orderly transfer of the family estate. The acknowledgment of an additional child necessarily diminishes the estate of any other

children. An adopted stepchild should not have to refute an element of financial gain in order to bring herself or himself within the class entitled to enjoy the benefits of the estate. There will always be the concern that an adult adoption may be an attempt to avoid the restrictions of a limited power of appointment or the lack of any power of appointment, or even that it is motivated purely by spite, but the rigors of trial are sufficient to bring fraud to light without the assistance of presumptions which cast aspersions on an entire class of persons.

In the case before us, there was ample evidence of a strong father-daughter relationship between the respondent and Marcellus N. Joslyn. It was respondent who cared for Mr. Joslyn during his last days. Although it is conceded by all that the adoption was related to the death of Marcellus N. Joslyn's father and the earlier will contest, the trial court was not compelled to conclude that the motive or purpose of this adoption was spite.

It was argued to this court that the trial court rejected the second prong of *Pittman* as dicta and refused to apply it, but the trial court struck the language making this assertion from the proposed statement of decision and instead inserted language relying on the first prong of *Pittman* as constituting the public policy of California established earlier by the Supreme Court in *Estate of Stanford, supra*, 49 Cal.2d 120, 135.

Even as stated by the *Pittman* court, to reject respondent as a member of this class it would have to be established that spite was the "purpose" of this adoption. Surely it is a question for the trier of fact as to the real motivation for an adoption but we conclude that where, as here, the adoptee was a member of the father's household as a minor and there is evidence of a true father-daughter relationship, public policy dictates that the relationship should be deemed the "purpose" of the adoption.

The trial court having performed this precise analysis, and substantial evidence supporting its conclusion, the judgment directing the trustee to include respondent as a beneficiary of the Marcellus N. Joslyn Fund established under the will of Alice Joslyn is affirmed.

Epstein, J., and Hastings, J., concurred.